# In the United States Court of Appeals for the Second Circuit

SYNTEL STERLING BEST SHORES MAURITIUS LTD., SYNTEL, INC.,
PLAINTIFFS-COUNTER-DEFENDANTS-PETITIONERS

*v.*

THE TRIZETTO GROUP, INC., COGNIZANT TECHNOLOGY SOLUTIONS CORP.,
DEFENDANTS-COUNTER-CLAIMANTS-RESPONDENTS

*ON PETITION FOR PERMISSION TO APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 15-211)
(THE HONORABLE LORNA G. SCHOFIELD, J.)*

**PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b)
OR FOR A WRIT OF MANDAMUS**

JAREN JANGHORBANI
CRYSTAL L. PARKER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*

KANNON K. SHANMUGAM
JAMES DURLING
ANNA J. GOODMAN
BENJAMIN M. MILLER-GOOTNICK
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

## CORPORATE DISCLOSURE STATEMENT

Petitioner Syntel Sterling Best Shores Mauritius Ltd. (n/k/a Syntel Holding Mauritius Ltd.) is a wholly owned subsidiary of petitioner Syntel, Inc. (n/k/a Syntel LLC), which is a wholly owned indirect subsidiary of Atos SE. Atos SE has no parent corporation, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

Introduction ........................................................................................1

Statement of the issue ......................................................................2

Background ........................................................................................3

Argument ........................................................................................10

    I.     This Court should grant an interlocutory appeal ..........................10

          A.    The order involves a controlling question of law ................11

          B.    There is a substantial ground for difference of opinion ..................................................................12

          C.    An appeal would materially advance the ultimate termination of this litigation ..................................15

    II.    In the alternative, this Court should issue a writ of mandamus ..................................................................18

Conclusion ......................................................................................21

# TABLE OF AUTHORITIES

Page

## CASES

*Callahan* v. *County of Suffolk*, 96 F.4th 362 (2d Cir. 2024) ...............................12

*Cheney* v. *United States District Court for District of Columbia*, 542 U.S. 367 (2004) ..........................................................................18

*Conde Vidal, In re*, 818 F.3d 765 (1st Cir. 2016) ................................................20

*De Csepel* v. *Republic of Hungary*, 27 F.4th 736 (D.C. Cir. 2022) ...................12

*Duplan Corp.*, *In re*, 591 F.2d 139 (2d Cir. 1978)...........................................11

*Dynex Capital, Inc. Security Litigation, In re*, Civ. No. 05-1897, 2006 WL 1517580 (S.D.N.Y. June 2, 2006)......................................15

Page

Cases—continued:

*FCC, In re*, 217 F.3d 125 (2d Cir. 2000)........................................................18, 20

*General Atomic Co.* v. *Felter*, 436 U.S. 493 (1978)........................................19

*Havlish* v. *650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019) ........................13, 14

*ICSTI Oregon, Inc.* v. *International Longshore & Warehouse Union*, 22 F.4th 1125 (9th Cir. 2022)...............................................15

*Ivan F. Boesky Securities Litigation, In re*, 957 F.2d 65 (2d Cir. 1992) ...................................................................18

*Johnson* v. *Burken*, 930 F.2d 1202 (7th Cir. 1991).....................................11

*Klinghoffer* v. *S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro In Admministrazione Straordinaria*, 921 F.2d 21 (2d Cir. 1991) .....................................................................11

*Methyl Tertiary Butyl Ether, In re*, 399 F. Supp. 2d 320 (S.D.N.Y. 2005)..............................................12

*Ortiz-Del Valle* v. *NBA*, 190 F.3d 598 (2d Cir. 1999).................................19

*Pentacon BV* v. *Vanderhaegen*, Civ. No. 23-2172, 2024 WL 3835334 (S.D.N.Y. Aug. 15, 2024).....................................11

*Reese* v. *BP Exploration (Alaska) Inc.*, 643 F.3d 681 (9th Cir. 2011)..................................................11, 12

*Sanford Fork & Tool Co., In re*, 160 U.S. 247 (1895).................................19

*Sterk* v. *Redbox Automated Retail, LLC*, 672 F.3d 535 (7th Cir. 2012).................................................................15

*Syntel Sterling Best Shores Mauritius Ltd.* v. *TriZetto Group, Inc.*, 68 F.4th 792, *cert. denied*, 144 S. Ct. 352 (2023)..........................*passim*

*Tantaros* v. *Fox News Network, LLC*, 465 F. Supp. 3d 385 (S.D.N.Y. 2020).....................................11, 15

Page

Case—continued:

*Zakrzewska* v. *New School*, 574 F.3d 24 (2d Cir. 2009) ..................................... 12

## STATUTES

Defend Trade Secrets Act of 2016, Pub. L. No. 114-153,
130 Stat. 376 ........................................................................ *passim*

28 U.S.C. § 1292(b) ................................................................ *passim*

**INTRODUCTION**

Petitioners Syntel Sterling Best Shores Mauritius Ltd. and Syntel, Inc. (collectively, "Syntel"), respectfully petition this Court pursuant to 28 U.S.C. § 1292(b) for permission to appeal the district court's order granting a new trial on compensatory damages. Syntel seeks review of the question whether the Court's earlier decision in this case prohibits a new trial on compensatory damages for the counterclaims brought by respondents TriZetto Group, Inc., and Cognizant Technology Solutions Corporation (collectively, "TriZetto"). *See* 68 F.4th 792, *cert. denied*, 144 S. Ct. 352 (2023). The district court (Schofield, J.) correctly determined that the question satisfies the three criteria specified in Section 1292(b), and this Court should exercise its discretion to review the district court's order.

*First*, the order involves a controlling question of law. This Court can resolve the dispute about the meaning of its earlier decision and will be able to do so quickly and cleanly without delving into the record. The question is also clearly controlling. As the district court recognized, its answer could all but resolve this case.

*Second*, there is a substantial ground for difference of opinion. By ordering a new trial on compensatory damages, the district court exceeded the careful limits that this Court placed on the scope of its remand. And the district court itself recognized that the question was "close." At a minimum, there are substantial grounds for challenging the order.

(1)

*Third*, an immediate appeal would materially advance the ultimate termination of this litigation. The district court correctly recognized that an appeal would remove a critical issue from post-trial appellate review and could eliminate the need for a new trial (as well as further discovery).

In the alternative, this Court should exercise its discretion to issue a writ of mandamus and resolve the question presented on that basis. If the Court declines to grant the petition for permission to appeal, Syntel has no other adequate means to attain the relief it seeks. Syntel also has a clear and undisputable right to issuance of the writ, and the writ is appropriate to ensure that this Court's mandate is faithfully enforced.

Finally, Syntel respectfully submits that this petition should be referred to the panel that heard the previous appeal, because the question presented concerns the meaning of the panel's earlier decision.

## STATEMENT OF THE ISSUE

Whether the district court violated this Court's mandate in *Syntel Sterling Best Shores Mauritius Ltd.* v. *TriZetto Group, Inc.*, 68 F.4th 792, *cert. denied*, 144 S. Ct. 352 (2023), by ordering a new trial on compensatory damages on remand.

## BACKGROUND

1.      Syntel is an information-technology company that provides software installation and support services. *See* 68 F.4th at 796-798. TriZetto develops software for health-insurance companies. *See id.* In 2015, Syntel filed suit against TriZetto in the Southern District of New York, alleging, among other things, that TriZetto had failed to pay Syntel rebates it owed under a services agreement between the parties. *See* D. Ct. Dkt. 1, 39. TriZetto counterclaimed, alleging, among other things, that Syntel misappropriated TriZetto's trade secrets. *See* D. Ct. Dkt. 215. Specifically, TriZetto brought counterclaims for (1) trade secret misappropriation under the Defend Trade Secrets Act (DTSA); (2) trade secret misappropriation under New York law; and (3) copyright infringement under federal law. *See* D. Ct. Dkt. 215. The district court held a jury trial in 2020. *See* D. Ct. Dkt. 931.

As this Court previously explained, TriZetto chose to pursue an "avoided costs" theory of compensatory damages at trial. TriZetto argued that Syntel avoided $285 million in research and development costs by misappropriating trade secrets and that TriZetto was accordingly entitled to $285 million in damages. *See* 68 F.4th at 798-799. TriZetto's expert presented two general methods of calculating damages: one based on avoided costs (both directly and as a reasonable royalty), and a second based on lost profits. *See id.* at 798, 811 n. 37. TriZetto then deliberately abandoned the lost-profits approach and

3

went all-in on the avoided-costs approach, presumably because the $285 million in purported avoided costs was significantly higher than the $8.5 million in lost profits. *See id.* at 798. Indeed, TriZetto intentionally declined to give the jury the option of specifying the amount of lost profits in calculating damages and asked only for avoided costs. *See id.* at 799, 811 n.37. TriZetto took that approach even though Syntel argued throughout the litigation that avoided-costs-based damages were inconsistent with the law. *See, e.g.*, D. Ct. Dkt. 728, 781, 878, 884, 1112.

At the end of trial, the jury ruled for TriZetto. *See* D. Ct. Dkt. 931, at 2. Just as TriZetto asked, the jury used the avoided-costs approach to calculate damages for all the claims. *See id.* at 4; *see also* 68 F.4th at 798; D. Ct. Dkt. 1134, at 6-8. The jury awarded approximately $285 million in compensatory damages on the DTSA claim, as well as approximately $142 million on the New York trade secret claim and $59 million on the copyright claim. *See* D. Ct. Dkt. 931, at 4. The jury ultimately remitted the damages awards on the New York trade secret and copyright claims to avoid double-counting. *See id.*

The jury also awarded TriZetto approximately $570 million in punitive damages. *See* D. Ct. Dkt. 931, at 6. Following post-trial briefing, the district court reduced the punitive damages to $285 million because it determined that "a 1:1 ratio relative to the compensatory award [was] the highest permissible award" under the law. *See* D. Ct. Dkt. 977, at 24, 32.

4

2.     Syntel appealed both the jury's finding of liability and its award of damages.  As is relevant here, Syntel argued that the DTSA did not permit an avoided-costs theory of compensatory damages on the facts of this case.  *See* 21-1370 Syntel Br. at 44-60.  Syntel therefore requested that this Court "vacate the judgment below" and direct the district court on remand to enter an "accordingly adjusted punitive damages award." *Id.* at 60.

This Court affirmed the district court's judgment with respect to liability but vacated the award of damages under the DTSA.  *See* 68 F.4th at 807.  The Court held that avoided costs were not a proper basis for damages in this case because "TriZetto suffered *no compensable harm*" beyond lost profits, so awarding compensatory damages on an avoided-costs theory would "entitle TriZetto to a windfall." *Id.* at 814 (emphasis in original).  The Court remanded for the district court to address the New York trade secret and copyright damages awards.  Those awards were also calculated on the basis of avoided costs, but this Court did not resolve their propriety because "the jury, to avoid double-counting, did not factor them into their total compensatory damages award." *Id.*

At the end of its opinion in a section entitled "Disposition," this Court specifically emphasized that it was "*not* remand[ing] for the [district] court to determine if TriZetto is entitled to lost profit damages" under the DTSA.  68 F.4th at 814 (emphasis in original).  That was because "the verdict form that

TriZetto proposed . . . did not ask the jury to determine if (and to what amount) TriZetto was entitled to lost profit damages" and because "TriZetto [did] not argue on appeal that it [was] entitled to its lost profits if [the Court] vacate[d] the avoided costs award." *Id.* at 814-815. Accordingly, this Court stated that it "d[id] not instruct the district court to consider the issue on remand." *Id.* at 815.

With respect to punitive damages, the Court recognized that Syntel "ask[ed] [it] to 'direct the district court on remand' to 'adjust the punitive damages award' should [it] vacate the district court's DTSA compensatory damages judgment." *Id.* at 806 n.19 (citing Syntel Br. 59-60). The Court did not address Syntel's request directly, but instead directed the district court to conduct "further proceedings" consistent with its opinion, which required the court to consider the New York trade secret and copyright awards in light of this Court's determination that avoided costs were not an appropriate measure of compensatory damages. *Id.* at 815; *see also id.* at 807.

3.     On remand, the district court directed the parties to propose how to proceed. The parties submitted a joint letter agreeing to "supplemental briefing concerning the damages award," including "[the parties'] views concerning the amount of compensatory and punitive damages that should be awarded to TriZetto." D. Ct. Dkt. 1096, at 1.

TriZetto did not request a new trial, with respect to compensatory damages or otherwise, either in that letter or in its opening supplemental brief to the district court. *See* D. Ct. Dkt. 1096, at 1-2; D. Ct. Dkt. 1099, at 1-14. Instead, in its responsive supplemental brief, TriZetto asserted in an unsupported footnote (and in a half-sentence in the conclusion) that a new trial would be required if its damages request in its opening brief was rejected. *See* D. Ct. Dkt. 1109, at 7 n.4, 11; *see also* D. Ct. Dkt. 1121, at 5.

With respect to punitive damages, by contrast, Syntel argued that "there [could] be no punitive damages" without compensatory damages and that the "punitive damages award must be no greater than the final compensatory damages award." D. Ct. Dkt. 1098, at 14. TriZetto responded to this argument without contending that it was outside the scope of the Court's remand. *See* D. Ct. Dkt. 1099, at 9-14.

In March 2024, the district court confirmed that the remaining two compensatory-damages awards—on the New York trade secret claim and the copyright claim—had to be vacated in light of this Court's decision that avoided costs were not an appropriate measure of compensatory damages. *See* D. Ct. Dkt. 1134, at 17. In a footnote, however, the court concluded that the punitive-damages award was "not within the scope of th[is] [Court's] remand" because this Court had "acknowledge[d] Syntel's request" for an adjustment of punitive damages on remand but "did not address or grant it." *Id.* at 3 n.2. The

7

district court stayed its judgment pending "any follow-on motions" from the parties. *Id.* at 17.

The parties filed letter briefs advising the district court of their differing opinions on whether TriZetto was entitled to a new trial on damages and on whether the court could award any punitive damages to TriZetto. *See* D. Ct. Dkt. 1135 at 1-2; D. Ct. Dkt. 1136, at 1-2. TriZetto's letter brief was the first time it clearly raised the argument that it was entitled to a new trial on damages. *See* D. Ct. Dkt. 1136, at 1-2. Syntel opposed the request for a new trial, explaining that TriZetto had forfeited it. *See* D. Ct. Dkt. 1135, at 2. The district court ordered further briefing on the issue. *See* D. Ct. Dkt. 1138, at 1. In that briefing, Syntel explained that TriZetto was not entitled to a new trial because, among other reasons, this Court's mandate foreclosed TriZetto from seeking lost profits on remand. *See* D. Ct. Dkt. 1148, at 5-12. TriZetto, in turn, requested a new trial on compensatory damages but did not offer any theory on which it would seek compensatory damages beyond lost profits. *See* D. Ct. Dkt. 1145, at 2-11.

The district court also ordered further briefing related to Syntel's argument that TriZetto could no longer recover punitive damages. *See* D. Ct. Dkt. 1137, at 1. Syntel argued that there was no pending punitive-damages judgment to amend and that, if there were, it should be amended to zero because the court had vacated all compensatory damages on which punitive damages

could be based. *See* D. Ct. Dkt. 1140, at 5-11. TriZetto argued in response that this Court's mandate prohibited the district court from amending the award of punitive damages and that it was entitled to the entire $285 million punitive-damages award even if compensatory damages were set at $0. *See* D. Ct. Dkt. 1150, at 5-15.

On October 23, 2024, the district court ordered a new trial on compensatory damages. *See* D. Ct. Dkt. No. 1155, at 6. The court considered Syntel's argument that granting a new trial would violate this Court's directive that it "d[id] not instruct the district court to consider the [lost profits] issue on remand." *Id.* at 5. In its view, however, this Court "did not address, much less foreclose, seeking a jury verdict on that issue" because the "issue of lost profits was not before [the Court]." *Id.* The district court did not address Syntel's argument that TriZetto could no longer recover punitive damages.

4. Syntel promptly asked the district court to certify two questions for interlocutory appeal: namely, whether this Court's mandate (1) permitted the district court to order a new trial on compensatory damages and (2) prohibited the district court from adjusting the original punitive-damages award. *See* D. Ct. Dkt. 1163, at 1-2. TriZetto opposed certification on both questions. *See* D. Ct. Dkt. 1167, at 1-2.

On November 13, 2024, the district court certified the first question for interlocutory appeal. *See* D. Ct. Dkt. 1169, at 4. The district court concluded

9

that the issue involved a controlling question of law because its answer could all but resolve this case; that there was substantial ground for difference of opinion because "the issue of whether a new trial may occur is a close question"; and that an immediate appeal would materially advance the ultimate termination of this litigation "by eliminating a critical issue from post-trial appellate review and potentially negating the need for a new trial," as well as further discovery. *Id.* at 3-4.[*] The district court did not certify the second question concerning punitive damages, reasoning that it had not yet resolved that issue and that "resolution of the compensatory damages issue may negate the need to address the punitive damages issue." *Id.* at 2, 4.

## ARGUMENT

## I. THIS COURT SHOULD GRANT AN INTERLOCUTORY APPEAL

Under 28 U.S.C. § 1292(b), a party may move to appeal an order that does not constitute a final judgment. This Court may exercise its discretion to grant permission to appeal where (1) the order "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion,"

---

[*] The district court has scheduled the new trial to begin on June 16, 2025, and directed the parties to submit pre-trial filings as early as April 14, 2025. D. Ct. Dkt. 1168, at 1. The court has further directed the parties to propose a plan for further discovery by November 26, 2024, and the parties anticipate that the district court's ordered schedule will require all discovery to be completed in the coming months. D. Ct. Dkt. 1170, at 1. Those upcoming deadlines highlight the need for expeditious relief from this Court. In the event this Court grants the petition for permission to appeal, Syntel intends to seek a stay pending the outcome of this appeal.

and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). As the district court held, the question in this case satisfies all three criteria, and this Court should exercise its discretion to review the district court's order granting a new trial on compensatory damages.

### A. The Order Involves A Controlling Question Of Law

For purposes of 28 U.S.C. § 1292(b), a "question of law" is one that can be decided "quickly and cleanly without having to study the record." *Tantaros* v. *Fox News Network, LLC*, 465 F. Supp. 3d 385, 389 (S.D.N.Y. 2020) (citation omitted). For such a question to be "controlling," its resolution "need not necessarily terminate [the] action." *Klinghoffer* v. *S.N.C. Achille Lauro Ed Altri- Gestione Motonave Achille Lauro In Admministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1991). Instead, it suffices that reversal would "significantly affect the conduct of the action" going forward. *Pentacon BV* v. *Vanderhaegen*, Civ. No. 23-2172, 2024 WL 3835334, at *14 (S.D.N.Y. Aug. 15, 2024) (citation omitted); *see also In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978); *Reese* v. *BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011); *Johnson* v. *Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991).

The district court correctly held that whether this Court's mandate permits a new trial on compensatory damages is a controlling question of law. *See* D. Ct. Dkt. 1169, at 3. It is a question of law because the Court can resolve the

meaning of its earlier decision and will be able to do so quickly and cleanly without having to delve into the record. *See, e.g.*, *Callahan* v. *County of Suffolk*, 96 F.4th 362, 367-368 (2d Cir. 2024); *see also De Csepel* v. *Republic of Hungary*, 27 F.4th 736, 745-746 (D.C. Cir. 2022). As the district court put it, this Court "need only interpret its prior decision and explain whether that decision, as a matter of law, permits a new trial on damages." D. Ct. Dkt. 1169, at 3. The question is also controlling because it will significantly affect the future conduct of this action. Indeed, as the district court recognized, its answer could all but resolve this case, eliminating the need for a new trial and a subsequent appeal on this very issue. D. Ct. Dkt. 1169, at 3-4; *see* pp. 15-16, *infra*.

## B.    There Is A Substantial Ground for Difference Of Opinion

The question in this case also presents a "substantial ground for difference of opinion." 28 U.S.C. § 1292(b). For this criterion, the Court should "analyze the strength of the arguments in opposition to the challenged ruling" to "determine whether there is 'substantial doubt' that the district court's [underlying] order was correct." *In re Methyl Tertiary Butyl Ether*, 399 F. Supp. 2d 320, 322-323 (S.D.N.Y. 2005) (citation omitted); *see also Zakrzewska* v. *New School*, 574 F.3d 24, 27 (2d Cir. 2009); *Reese*, 643 F.3d at 688.

As above, the district court correctly held that there are substantial grounds for challenging its order granting a new trial on compensatory damages—an order that clearly violates this Court's mandate. *See* D. Ct. Dkt. 1169, at 3. It is well settled that a "district court must follow the mandate issued by an appellate court." *Havlish* v. *650 Fifth Ave. Co.*, 934 F.3d 174, 181 (2d Cir. 2019) (citations omitted). Thus, "[w]here a mandate limits the issues open for consideration on remand, a district court ordinarily cannot consider additional issues." *Id.* at 182 (citation omitted). And "[w]here an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, the mandate rule generally prohibits the district court from reopening the issue on remand unless the mandate can reasonably be understood as permitting it to do so." *Id.* at 181-182 (citation omitted). In this case, the district court contravened those well-settled principles.

In its earlier decision, this Court made clear the limits on its remand to the district court. The Court concluded that the only "compensable harm" experienced by TriZetto under the DTSA was lost profits. 68 F.4th at 814. The Court then emphasized that it was "*not* remand[ing] for the [district] court to determine if TriZetto is entitled to lost profit damages." *Id.* (emphasis in original). The Court clarified that was because TriZetto had declined to ask the jury to award lost-profits damages and had not argued "on appeal that it [was] entitled to its lost profits if [this Court] vacate[d] the avoided costs award." *Id.*

13

at 815. For those reasons, the Court reiterated that it "d[id] not instruct the district court to consider the issue on remand." *Id.* Together, those statements make clear that the Court did not intend for the district court to revisit the issue of lost profits on remand and that the district court's order granting a new trial plainly contravened this Court's mandate. *See Havlish*, 934 F.3d at 181-182.

That result not only is dictated by this Court's earlier decision but also makes sense in light of TriZetto's strategic decisions in this case. As explained above, TriZetto expressly *declined* to have the jury make any finding about its lost profits, choosing instead to gamble on a damages theory that was wholly out of proportion to its actual injury in this case. *See* p. 4, *supra.* TriZetto did so even though Syntel objected at every turn that avoided-costs damages were not permitted by law. *See id.* On appeal, TriZetto again chose to seek only damages based on avoided costs and failed to ask for a new trial based on lost profits (even in the alternative). In its earlier decision, this Court recognized those strategic choices and held that TriZetto—a sophisticated party represented by sophisticated counsel—was bound by them. *See* 68 F.4th at 814-815. The Court should grant an interlocutory appeal to reaffirm that straightforward conclusion.

For its part, the district court reasoned that this Court "did not address, much less foreclose, seeking a jury verdict" on lost profits because the issue

14

was purportedly "not before [the Court]" in the previous appeal. D. Ct. Dkt. 1155, at 5. But as just explained, the Court *did* consider the issue of lost profits in its earlier decision and concluded that TriZetto's failure to seek such damages either at trial or on appeal barred it from seeking lost profits on remand. *See* 68 F.4th at 814-815. The district court's contrary conclusion is inexplicable. At a minimum—and as the district court subsequently recognized—there is "genuine doubt" about whether it correctly interpreted this Court's mandate. D. Ct. Dkt. 1169, at 3 (citation omitted).

## C.   An Appeal Would Materially Advance The Ultimate Termination Of This Litigation

An appeal materially advances the ultimate termination of the litigation where it may expedite its resolution and avoid wasted efforts by both the parties and the district. *See, e.g.*, *Tantaros* v. *Fox News Network, LLC.*, 465 F. Supp. 3d 385, 389, 392-393 (S.D.N.Y. 2020); *In re Dynex Capital, Inc. Security Litigation*, Civ. No. 05-1897, 2006 WL 1517580, at *3 (S.D.N.Y. June 2, 2006); *see also ICSTI Oregon, Inc.* v. *International Longshore & Warehouse Union*, 22 F.4th 1125, 1131 (9th Cir. 2022); *Sterk* v. *Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012).

As the district court recognized, an interlocutory appeal in this case "would materially advance the ultimate termination of the litigation by eliminating a critical issue from post-trial appellate review and potentially negating

the need for a new trial," as well as "additional discovery and pre-trial litigation." D. Ct. Dkt. 1134, at 4. In this way, an immediate appeal will "prevent a waste of judicial and party resources and [will] streamline resolution of the issues remaining in this nearly ten-year-old case, as compared to conducting a new trial followed by a later appeal on the same issues." *Id.* That is particularly true here where, as discussed above, TriZetto is so clearly precluded from seeking a new trial by this Court's earlier decision. *See* pp. 13-15. The Court's immediate review will avoid the risk that the parties and the district court will expend substantial time and resources conducting a new trial, only to be told later by this Court that the whole exercise was improper.

If the Court concludes that a new trial on compensatory damages is outside the scope of its remand, this case can be quickly and efficiently brought to a conclusion. Both this Court and the district court have already made clear that there are *no* compensatory damages available to TriZetto without a new trial. *See* 68 F.4th at 814; D. Ct. Dkt. 1169, at 4-8. Thus, all that is left to do before the entry of a new judgment is the adjustment of the punitive damages to reflect the absence of any compensatory damages. With that adjustment, the district court can enter an amended judgment, and the case will finally be over.

In order further to advance the final resolution of this litigation, the Court may also wish to clarify that its mandate likewise permits—if not requires—the district court to adjust the punitive-damages award in light of the corrected compensatory-damages award. *See* 68 F.4th at 807, 815. In its order certifying an interlocutory appeal under § 1292(b), the district court stated that it had "not yet addressed the issue of punitive damages and likely will not do so until after a determination of what, if any, compensatory damages Tri-Zetto is entitled to recover." D. Ct. Dkt. 1169, at 1; *see id.* at 2. Syntel thus anticipates that the district court will make the appropriate adjustment to the punitive-damages award once this Court clarifies that its earlier decision forecloses a new trial on compensatory damages. That said, the district court had previously suggested that this Court's earlier decision *prohibited* it from adjusting the award of punitive damages. *See* D. Ct. Dkt. 1134, at 3 n.2. Although an immediate appeal would materially advance this litigation regardless, this Court may wish to take the opportunity to clarify the scope of its remand with respect to the issue of punitive damages as well, so as to avoid an unnecessary return trip to the Court down the road.

*    *    *    *    *

For the foregoing reasons, this Court should find that the question in this case satisfies the criteria for an immediate appeal under 28 U.S.C. § 1292(b) and should exercise its discretion to hear the appeal.

## II.   IN THE ALTERNATIVE, THIS COURT SHOULD ISSUE A WRIT OF MANDAMUS

In the alternative, and in the interest of expeditiously resolving this decade-old litigation, this Court should grant a writ of mandamus to prevent the district court from contravening its mandate.  Mandamus is appropriate where (1) the petitioner has "no other adequate means to attain the relief [it] desires"; (2) the petitioner's "right to issuance of the writ is clear and indisputable"; and (3) the issuing court is "satisfied that the writ is appropriate under the circumstances."  *Cheney* v. *United States District Court for District of Columbia*, 542 U.S. 367, 380-381 (2004) (internal quotation marks and citation omitted).  This Court has recognized that mandamus is particularly appropriate to ensure that a lower court follows the terms of an appellate court's mandate.  *See, e.g.*, *In re FCC*, 217 F.3d 125, 133 (2000); *In re Ivan F. Boesky Securities Litigation*, 957 F.2d 65, 69 (1992).  Syntel satisfies all three criteria for mandamus relief.

*First*, if this Court declines to hear an interlocutory appeal under 28 U.S.C. § 1292(b), Syntel will have no other adequate means to attain its desired relief:  namely, avoiding a new trial on compensatory damages that it believes this Court's earlier decision forecloses.  *See, e.g.*, *Ortiz-Del Valle* v. *NBA*, 190 F.3d 598, 599 (2d Cir. 1999).  Absent intervention from this Court, the parties and district court will waste time and resources on a new trial.  Syntel is entitled to the full benefit of the mandate that this Court has already crafted and

has no adequate alternative other than securing (again) that mandate from this Court.

*Second*, Syntel's right to issuance of the writ is clear and indisputable. As discussed above, this Court's mandate clearly prohibits the district court from ordering a new trial on compensatory damages. *See* pp. 13-15. This Court stated that the only theory on which TriZetto could recover was lost profits and then specifically precluded the district court from considering lost profits on remand. *See* 68 F.4th at 814. Further, if the Court chooses to reach the issue, it is also clear that its earlier decision in no way prohibits the district court from adjusting the award of punitive damages to ensure its consistency with the corrected award of compensatory damages. Syntel's right to the writ is clear.

*Third*, the writ is appropriate under the circumstances. The Supreme Court has explained that mandamus is appropriate where "a lower court mistakes or misconstrues" the mandate of a higher court, in which case the lower court's "actions may be controlled by a writ of mandamus." *General Atomic Co.* v. *Felter*, 436 U.S. 493, 497 (1978) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)) (alteration omitted). This Court has likewise observed that mandamus is appropriate to ensure that "the terms of the mandate [are] scrupulously and fully carried out" and that the inferior court's "actions on remand [are] not . . . inconsistent with either the express terms or the

19

spirit of the mandate." *FCC*, 217 F.3d at 133 (citations and alterations omitted); *see also In re Conde Vidal*, 818 F.3d 765, 767 (1st Cir. 2016) (collecting cases). In this case, too, mandamus is both appropriate and necessary to ensure that the district court fully and faithfully carries out this Court's mandate.

Accordingly, in the event this Court does not grant the petition for permission to appeal, it should issue a writ of mandamus and direct the district court that that this Court's mandate prohibits it from holding a new trial on compensatory damages.

## CONCLUSION

The petition for permission to appeal under 28 U.S.C. § 1292(b) should be granted. In the alternative, the Court should grant the petition for a writ of mandamus and direct the district court that it may not conduct a new trial on compensatory damages.

Respectfully submitted,

/s/ Kannon K. Shanmugam

JAREN JANGHORBANI
CRYSTAL L. PARKER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

KANNON K. SHANMUGAM
JAMES DURLING
ANNA J. GOODMAN
BENJAMIN M. MILLER-GOOTNICK
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

NOVEMBER 25, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for petitioners and a member of the Bar of this Court, certify, pursuant to Federal Rules of Appellate Procedure 5(c), 21(d), 32(a)(5), and 32(c)(2), that the attached petition is proportionately spaced, has a typeface of 14 points or more, and contains 4,820 words.

NOVEMBER 25, 2024

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for petitioners and a member of the Bar of this Court, certify that, on November 25, 2024, the attached petition was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit. I also certify that, on the same day, I served the attached petition on all parties to the proceedings in the district court, as well as on the district judge.

NOVEMBER 25, 2024                          /s/ Kannon K. Shanmugam
                                           KANNON K. SHANMUGAM


Michael W. De Vries
michael.devries@kirkland.com

Justin Singh
justin.singh@kirkland.com

Andrew Morrill
drew.morrill@kirkland.com

Sam Blake
sam.blake@kirkland.com

Adam R. Alper
aalper@kirkland.com

Gianni Cutri
gianni.cutri@kirkland.com

Jake Rambeau
jake.rambeau@kirkland.com

Patricia Carson
patricia.carson@kirkland.com

Leslie M. Schmidt
leslie.schmidt@kirkland.com

Joshua L. Simmons
joshua.simmons@kirkland.com

Ryan Kane
ryan.kane@kirkland.com

Jason M. Wilcox
jason.wilcox@kirkland.com

Hon. Lorna G. Schofield
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

# APPENDIX

# TABLE OF CONTENTS

District-court order on Syntel's motion requesting
    certification for interlocutory appeal, Nov. 13, 2024 ..............................Ex. 1

District-court order on TriZetto's motion for a
    new trial on compensatory damages, Oct. 23, 2024 .................................Ex. 2

District-court order on remand regarding damages
    and attorney's fees, Mar. 13, 2024 ............................................................Ex. 3

Second Circuit opinion in *Syntel Sterling Best Shores*
    *Mauritius Ltd.* v. *TriZetto Group, Inc.*, 68 F.4th 792,
    *cert. denied*, 144 S. Ct. 352 (2023) ............................................................Ex. 4

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
                                                    :
SYNTEL STERLING BEST SHORES MAURITIUS               :
LTD., et al.,                                       :
                                    Plaintiffs,     :        15 Civ. 211 (LGS)
                                                    :
                      -against-                     :           ORDER
                                                    :
THE TRIZETTO GROUP, INC., et al.,                   :
                                    Defendants,     :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

   WHEREAS, after a remand from the Second Circuit, *see Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792 (2d Cir. 2023), the Order dated October 23, 2024 (the "Order"), granted Counterclaim Plaintiffs The TriZetto Group, Inc.'s and Cognizant Technology Solutions Corporation's (together, "TriZetto") motion for a new trial on damages.  The trial is scheduled to begin on June 16, 2025.  Per the parties' agreement, the retrial is limited to the issue of compensatory damages.

   WHEREAS, Counterclaim Defendants Syntel Sterling Best Shores Mauritius Limited and Syntel, Inc. (together, "Syntel") simultaneously moved to amend the original judgment to award $0 in punitive damages due to the vacatur of the remaining compensatory damages.  TriZetto opposed the motion.  The Court has not yet addressed the issue of punitive damages and likely will not do so until after a determination of what, if any, compensatory damages TriZetto is entitled to recover.

   WHEREAS, on November 4, 2024, Syntel filed a letter motion requesting certification of two questions for interlocutory appeal pursuant to 28 U.S.C. § 1292(b): whether the Second Circuit's mandate (1) permits this Court to order a new trial on compensatory damages and (2)

prohibits this Court from adjusting the original award of punitive damages.

WHEREAS, TriZetto opposed the certification.

WHEREAS, the second question, regarding any adjustment of punitive damages, is not certified because no decision has issued from which an appeal can be taken. "[T]he § 1292(b) procedure does not authorize an interlocutory appeal that would result in an advisory decision based on a premise that may be destroyed." *Benoit v. Saint-Gobain Performance Plastics Corp*., 959 F.3d 491, 508 (2d Cir. 2020).[1]  Without an order deciding Syntel's motion to amend the judgment to award $0 in punitive damages, there is no order addressing the issue to certify for appeal, and resolution of the compensatory damages issue may negate the need to address the punitive damages issue.

WHEREAS, certification of an interlocutory appeal requires that an otherwise not immediately appealable order (1) "involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion" and (3) "that an immediate appeal from the order may materially advance the ultimate termination of the litigation . . . ." 28 U.S.C. § 1292(b). Section 1292(b) is "a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v. Bank of Bermuda Ltd*., 101 F.3d 863, 865 (2d Cir. 1996); *accord In re Acetaminophen - ASD-ADHD Prod. Liab. Litig*., No. 22 Civ. 8830, 2023 WL 4976589, at *2 (S.D.N.Y. Aug. 3, 2023).

WHEREAS, all three factors are met here. First, the question involves controlling questions of law because it requires interpretation of the Second Circuit's mandate and application of the legal standards regarding permissibility of new trials under Federal Rule of Civil Procedure 59(a). Determining whether the Order complies with the Second Circuit's

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

mandate and applicable rules of civil procedure is a question of law and not fact.  *See Callahan v. Cnty. of Suffolk*, 96 F.4th 362, 367 (2d Cir. 2024) (holding whether a district court complied with a mandate is a question to be reviewed de novo by the Court of Appeals).  The Second Circuit's decision is the law of the case, which controls the permissible outcomes of TriZetto's motion for a new trial.  *Id*. at 367 n.6.  An answer to the certified question could resolve the only issues remaining in this case.  *See Bright v. Annucci*, No. 18 Civ. 11111, 2023 WL 5803648, at *4 (S.D.N.Y. Sept. 6, 2023) (holding a question of law is controlling if "reversal of the district court's opinion could result in dismissal of the action," or "reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action").  Contrary to TriZetto's argument that resolution of this question requires a fact-intensive inquiry, the Second Circuit need only interpret its prior decision and explain whether that decision, as a matter of law, permits a new trial on damages.

WHEREAS, there is substantial ground for difference of opinion because the issue of whether a new trial may occur is a close question.  A difference of opinion "must arise out of a genuine doubt as to the correct applicable legal standard relied on in the order."  *In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 Civ. 8741, 2023 WL 3293648, at *3 (S.D.N.Y. May 5, 2023).  "Genuine doubt exists where (1) there is conflicting authority on the issue or (2) the issue is particularly difficult and of first impression."  *Picard v. Est. of Madoff*, 464 B.R. 578, 582 (S.D.N.Y. 2011); *accord Rosenberg v. Educ. Credit Mgmt. Corp.*, No. 22 Civ. 8954, 2023 WL 6162940, at *4 (S.D.N.Y. Sept. 20, 2023).  While the Order concluded that the Second Circuit's mandate did not prevent a new trial on damages, the mandate did not speak directly to that issue.  The Second Circuit's decision provided a newly articulated legal limitation on the available damages theories.  Whether that decision permits a new trial is a close question that warrants

interlocutory appeal.

WHEREAS, certification of the appeal would materially advance the ultimate termination of the litigation by eliminating a critical issue from post-trial appellate review and potentially negating the need for a new trial. This factor "primarily concerns judicial efficiency," *Molner v. Reed Smith LLP (In re Aramid Ent. Fund Ltd.)*, No. 21 Civ. 4840, 2022 WL 118293, at *8 (S.D.N.Y. Jan. 12, 2022), and "is satisfied if that appeal promises to advance the time for trial or to shorten the time required for trial," *Ema Fin., LLC v. Vystar Corp.*, No. 19 Civ. 1545, 2021 WL 5998411, at *3 (S.D.N.Y. Dec. 20, 2021). "Courts place particular weight on [this factor]." *Id.* If Syntel's arguments are correct, the need for a new trial will be obviated, as would the need for additional discovery and pre-trial litigation of any related issues. This would prevent a waste of judicial and party resources and would streamline resolution of the issues remaining in this nearly ten-year-old case, as compared to conducting a new trial followed by a later appeal on the same issues. It is hereby

**ORDERED** that the following question is certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b): whether the Second Circuit's mandate permits the Court's October 23, 2024, Order for a new trial on compensatory damages.

Dated: November 13, 2024
     New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                          :
SYNTEL STERLING BEST SHORES                               :
MAURITIUS LTD., et al.,                                   :
                              Plaintiffs,    :            15 Civ. 211 (LGS)
                                                          :
            -against-                        :            ORDER
                                                          :
THE TRIZETTO GROUP, INC., et al.,            :
                              Defendants.  :
                                                          :
----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

WHEREAS, Counterclaim Plaintiffs The TriZetto Group, Inc. and Cognizant Technology

Solutions Corporation (together, "TriZetto"), move for a new trial on the issue of compensatory

damages.  TriZetto's motion argues (1) that it is within the Court's discretion to grant a new trial,

(2) that TriZetto did not waive its right to seek a new trial and (3) that a new trial is warranted

because the decision in *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 68 F.4th

792 (2d Cir. 2023) ("*Syntel*"), changed the law regarding available theories of damages and,

given the liability finding in TriZetto's favor and prior vacatur of the compensatory damages

awards, the current zero-dollar compensatory damages award is unjust.  TriZetto also requests

certain additional discovery should a new trial be granted.

WHEREAS, Counterclaim Defendants Syntel Sterling Best Shores Mauritius Limited and

Syntel, Inc. (together, "Syntel") oppose the motion.

WHEREAS, in the original trial, the jury returned a verdict for TriZetto on all counts.

The jury found that Syntel had misappropriated TriZetto's trade secrets, violating both the federal

Defend Trade Secrets Act ("DTSA") and New York law, and had infringed TriZetto's copyrights.

To compensate for Syntel's misappropriation, the jury found that TriZetto had suffered damages

of $284,855,192 in avoided development costs under the DTSA and half that amount,

$142,427,596, as a reasonable royalty under New York law.  The jury also found that TriZetto

had suffered damages of $59,100,000 as a reasonable royalty for Syntel's copyright infringement.

To avoid duplicative damages, the jury awarded TriZetto $284,855,192 in compensatory

damages, plus double that amount, $569,710,384, for punitive damages, for a total of

$854,565,576.  Although TriZetto presented the jury with evidence of its lost profits, it did not

argue them as a basis for an award to avoid duplicative damages.  Consequently, the jury was not

asked to determine, nor did it determine, whether or in what amount TriZetto may be entitled to

lost profit damages.

 WHEREAS, after trial, the punitive damages award, which was based on either or both of

the DTSA claim and the New York claim, was remitted to $284,855,192 on account of the "large

compensatory damages award" and "Syntel's reprehensible but not egregious conduct."  TriZetto

did not object to remittitur.  TriZetto's application for a permanent injunction was granted, and

Syntel was enjoined from using any of the trade secrets going forward.

 WHEREAS, on appeal to the Second Circuit, Syntel challenged both the liability finding

and the damages award under the DTSA.  The court affirmed Syntel's liability but vacated the

damages award.  *Syntel*, 68 F.4th 792 at 800, 807.  The Second Circuit held that avoided costs are

not available under the DTSA as a matter of law in a case like this one where Syntel's

misappropriation did not injure TriZetto beyond its $8.5 million in lost profits.  *Id.* at 807-14.

The Second Circuit had never previously addressed avoided costs as a theory of damages under

the DTSA, and no appellate court had previously adopted the Second Circuit's view of DTSA

damages.  *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 Civ. 211,

2021 WL 1553926, at *6-7 (S.D.N.Y. Apr. 20, 2021) (rejecting Syntel's post-trial challenge to

2

the damages award), *aff'd in part, vacated in part, remanded sub nom. Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792 (2d Cir. 2023).

WHEREAS, the Second Circuit remanded the case "to address the propriety of the two jury awards that were based on TriZetto's damages theory of awarding a reasonable royalty: (1) the $142,427,596 New York trade secret misappropriation award and (2) the $59,100,000 copyright infringement award." *Syntel*, 68 F.4th at 814. The mandate instructs that the case is not remanded for the Court "to determine if TriZetto is entitled to lost profit damages under § 1836(b)(3)(B)(i)(I) of the DTSA" because the verdict form "did not ask the jury to determine if (and to what amount) TriZetto was entitled to lost profit damages" and "[b]ecause TriZetto d[id] not argue on appeal that it is entitled to its lost profits . . . ." *Id.* at 814-15.

WHEREAS, on remand, the jury's award of $142,427,596 in reasonable royalty damages on the New York trade secret misappropriation claim was vacated because the amount bore no reasonable relation to the actual harm TriZetto had suffered. *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 Civ. 211, 2024 WL 1116090, at *3 (S.D.N.Y. Mar. 13, 2024). The $59,100,000 in reasonable royalty damages awarded on the Copyright Act claim was vacated on the same basis and because it was supported by insufficient evidence. *Id.* at *4. TriZetto's motion for $14,548,992.98 in attorneys' fees was granted. *Id.* Entry of judgment was stayed to allow the parties to file any follow-on motions. *Id.* at *8.

WHEREAS, under Rule 59(a), a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). In general, "[a] trial court should not grant a motion for a new trial unless it is convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Ali v.*

*Kipp*, 891 F.3d 59, 64 (2d Cir. 2018).[1]  District courts may grant this relief "for substantial

reasons," including "manifest error of law or mistake of fact."  *Ball v. Interoceanica Corp.*, 71

F.3d 73, 76 (2d Cir. 1995); *accord Smalls v. N.Y.C. Emps.' Ret. Sys.*, No. 18 Civ. 5428, 2021 WL

1292734, at *2 (S.D.N.Y. Apr. 7, 2021), *aff'd*, No. 21-1214, 2022 WL 728670 (2d Cir. Mar. 11,

2022).  "A new trial should not therefore be granted simply because the losing party thinks it may

do better given another opportunity." *LiButti v. United States*, 178 F.3d 114, 119 (2d Cir. 1999);

*accord Rinaldi v. SCA La Goutte, D'Or*, No. 16 Civ. 1901, 2022 WL 17370031, at *8 (S.D.N.Y.

Dec. 2, 2022).  A new trial also may be appropriate where a change in the law has occurred. *See,*

*e.g.*, *Sass v. MTA Bus Co.*, 6 F. Supp. 3d 229, 236 (E.D.N.Y. 2014) (collecting cases); *LiButti*, 178

F.3d at 119 (stating that an "intervening change in controlling law" can be an appropriate basis

for granting a new trial under Rule 59, although an amended judgment is often the preferred

correction); *Elsevier Inc. v. Grossmann*, No. 12 Civ. 5121, 2017 WL 1843298, at *6 (S.D.N.Y.

May 8, 2017) (granting a new trial for plaintiffs to present evidence under a different standard

after an intervening change in law).

WHEREAS, at trial, TriZetto relied in good faith on a theory of damages that it believed

was available under relevant law.  Syntel itself presented expert testimony on the amount of

damages TriZetto had suffered under each of the three theories of damages.  The Second Circuit

left undisturbed the jury's liability finding that Syntel misappropriated TriZetto's trade secrets

and that TriZetto was harmed as a result. *Syntel*, 68 F.4th at 811.  The jury awarded TriZetto the

largest amount of compensatory damages offered by TriZetto's expert, plus substantial punitive

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and
citations are omitted, and all alterations are adopted.

damages, resulting in a total award exceeding $850 million.  The jury expressed its clear view
about the harm to TriZetto and the maliciousness of Syntel's conduct.  Penalizing TriZetto with
no compensatory damages for relying on a colorable theory in an unclear area of law would be a
serious injustice and disrespect the jury's view.

WHEREAS, Syntel argues that granting a new trial would violate the appellate court's
mandate.  This is incorrect.  The Second Circuit stated, "Because TriZetto does not argue on
appeal that it is entitled to its lost profits if we vacate the avoided costs award, we do not instruct
the district court to consider the issue on remand."  *Id.* at 815.  The issue of lost profits was not
before the appellate court because the judgment on appeal did not include any finding on lost
profits.  "[A]t trial, TriZetto took the view that awarding lost profits and avoided costs would
constitute 'double counting' under the DTSA; [therefore] the verdict form . . . did not ask the jury
to determine . . . lost profit damages."  *Id.* at 814-15.  The Second Circuit did not address, much
less foreclose, seeking a jury verdict on that issue.

WHEREAS, Syntel argues that a new trial would be inappropriate because TriZetto's
error caused the need for a new trial, and TriZetto should not be rewarded with a second bite at
the apple.  Syntel relatedly argues that the Second Circuit did not change the relevant law and
that TriZetto could have presented alternative damages theories at trial but chose not to do so.
These arguments are unpersuasive.  TriZetto's original presentation relied on a fair understanding
of the available damages theories, which later was determined to be an error of law.  This is not a
situation where a losing party merely is unsatisfied with the outcome or thinks it could have
prevailed on a different theory.  At trial, the jury, the parties and the trial court all relied on an

incorrect understanding of the law, which lead to the jury's now-vacated verdict. A new trial on

damages is warranted based on a "manifest error of law." *Ball*, 71 F.3d at 76.

WHEREAS, TriZetto seeks to reopen discovery to obtain evidence it argues was

unavailable or that it had not foreseen to be relevant. TriZetto does not include specific requests

or categories of evidence, but instead states that it seeks Syntel's financial information from after

the close of discovery through the issuance of the injunction and materials related to theories that

arose during expert discovery. It is hereby

**ORDERED** that TriZetto's motion for a new trial on compensatory damages is

**GRANTED**. It is further

**ORDERED** that, by **October 30, 2024**, TriZetto shall file a letter stating specifically

what limited additional discovery TriZetto would seek if discovery were reopened (e.g., what

specific document demands, what interrogatories), why that discovery is proportional given the

late stage of the case and why that discovery was not sought earlier. By **November 6, 2024**,

Syntel shall file a letter in response. By **November 6, 2024**, the parties shall meet and confer and

file a joint letter proposal regarding the new trial, including the parties' proposed outline of the

matters to be presented at trial, including what stipulations and witnesses are contemplated.

Dated: October 23, 2024
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
SYNTEL STERLING BEST SHORES                                :
MAURITIUS LTD., et al.,                                    :
                                      Plaintiffs,          :          15 Civ. 211 (LGS)
                                                           :
                    -against-                              :               ORDER
                                                           :
THE TRIZETTO GROUP, INC., et al.,                          :
                                      Defendants.          :
                                                           :
-----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

At issue are damage awards in favor of Counterclaim Plaintiffs The TriZetto Group, Inc.

and Cognizant Technology Solutions Corporation (together, "TriZetto") against Counterclaim

Defendants Syntel Sterling Best Shores Mauritius Limited and Syntel, Inc. (together, "Syntel")

after a jury trial.  On May 25, 2023, the Second Circuit affirmed Syntel's liability for

misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") but

vacated the damages judgment under the DTSA.  *Syntel Sterling Best Shores Mauritius Ltd. v.

TriZetto Grp., Inc.*, 68 F.4th 792 (2d Cir. 2023) ("*Syntel*").  The matter was remanded to consider

the damages awards on two other causes of action the appellate court did not address.  For the

following reasons, these two compensatory damages awards, on the New York trade secret

misappropriation claim (the "New York Claim") and the federal copyright claim (the "Copyright

Claim"), are vacated.  TriZetto also filed a motion for attorney's fees, which is granted.

I.      BACKGROUND

On October 27, 2020, after a six-day jury trial, the jury returned a verdict for TriZetto on

all counts.  The jury found that Syntel had misappropriated TriZetto's trade secrets, violating both

the DTSA and New York law, and had infringed TriZetto's copyrights.  To compensate for

Syntel's misappropriation, the jury awarded TriZetto $284,855,192 in avoided development costs

under the DTSA and half that amount, $142,427,596, as a reasonable royalty under New York law, which does not permit recovery of avoided costs.  The jury also awarded $59,100,000 as a reasonable royalty for Syntel's copyright infringement.  To avoid duplicative damages, the jury ultimately limited its award to $284,855,192 in compensatory damages, with double that amount, $569,710,384, for punitive damages.

After trial, Syntel renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b),[1] moving in the alternative for a new trial or remittitur under Rule 59.  The post-trial motions were denied.  Syntel's challenge to liability and the DTSA compensatory damages award was rejected.  Although the parties had addressed the propriety of the jury's awards on the New York Claim and the Copyright Claim, the decision did not address them since the jury did not factor them into their total compensatory damages, relying exclusively on the DTSA damages.  The punitive damages award, which was based on either or both of the DTSA claim and the New York Claim, was remitted to $284,855,192 on account of the "large compensatory damages award" and "Syntel's reprehensible but not egregious conduct."  TriZetto did not object to remittitur.  TriZetto's application for a permanent injunction was granted, and Syntel was enjoined from using any of the trade secrets going forward.

On appeal to the Second Circuit, Syntel challenged both the liability finding and the damages award under the DTSA.  The court affirmed Syntel's liability.  *Syntel*, 68 F.4th 792 at 800.  However, it held that, as a matter of law, "an unjust enrichment award of avoided costs [under the DTSA] was unavailable under the specific facts of this case."  *Id.* at 814.  The DTSA damages judgment was vacated.  *Id.*  The court remanded the case "to address the propriety of the

---

[1] All references to Rules in this Opinion are to the Federal Rules of Civil Procedure unless otherwise stated.

two jury awards that were based on TriZetto's damages theory of awarding a reasonable royalty: (1) the $142,427,596 New York trade secret misappropriation award and (2) the $59,100,000 copyright infringement award." *Id.*[2] TriZetto filed a petition for certiorari on September 22, 2023, challenging the Second Circuit's holding on damages. That petition was denied on October 30, 2023. *TriZetto Grp., Inc. v. Syntel Sterling Best Shores Mauritius Ltd.*, 144 S. Ct. 352 (2023).

## II.  LEGAL STANDARD

Under Rule 50, judgment as a matter of law may be granted if a court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party." Fed. R. Civ. P. 50(a)(1). Such relief is appropriate "only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that a reasonable juror would have been compelled to accept the view of the moving party." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 54 (2d Cir. 2019).[3] A Rule 50 motion may be granted only if "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Perry v. City of New York*, 78 F.4th 502, 517 (2d Cir. 2023). "This standard presents a particularly heavy burden for Syntel, where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Syntel*, 68 F.4th at 800.

---

[2] The jury's punitive damages award is not within the scope of the Second Circuit's remand, which was explicit to the dollar, and says nothing about punitive damages. A footnote in the opinion confirms that the omission was intentional: "Syntel does not directly challenge the legality of the district court's permanent injunction or its punitive damages award. That said, it asks this Court to direct the district court on remand to adjust the punitive damages award should we vacate the district court's DTSA compensatory damages judgment." *Syntel*, 68 F.4th at 806 n.19. Despite acknowledging Syntel's request, the Second Circuit did not address or grant it.
[3] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

## III.   DISCUSSION

### A.  Damages

#### 1.  New York Claim Award

The jury awarded TriZetto $142,427,596 in damages on the New York Claim based on TriZetto's theory that the amount represented a reasonable royalty that Syntel would have paid for its infringing use of TriZetto's trade secrets.  This award is vacated because the amount bears no reasonable relation to the actual harm TriZetto suffered, as required by New York law.

The Second Circuit has "approved the concept of a reasonable royalty award that attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff" when "measuring either the defendant's profits or the plaintiff's losses is too hard or speculative." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 858 F.3d 744, 748 (2d Cir. 2017) (*E.J. Brooks I*) (New York law).  The Second Circuit made this statement in dicta in its decision certifying to the New York Court of Appeals the question of whether, under New York law, a plaintiff can recover as damages its costs of development which a defendant avoided in misappropriating the plaintiff's trade secret.  In the resulting decision, the New York Court of Appeals held that "a plaintiff bringing an unjust enrichment action may not recover as compensatory damages the costs that the defendant avoided due to its unlawful activity in lieu of the plaintiff's own losses." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 313 (N.Y. 2018) ("*E.J. Brooks II*").  Although the Court of Appeals did not squarely speak to whether and when the receipt of a reasonable royalty award may compensate an injured party, the court made important pronouncements about the nature of compensatory damages under New York law that guide the analysis here.[4]

_____

[4] One court in this district observed that, "while the Second Circuit has previously approved the

Damages in a trade secrets case "must be measured by the plaintiff's actual losses." *E.J. Brooks II*, 105 N.E.3d at 308. "To be sure, courts may award a defendant's unjust gains as a proxy for compensatory damages in an unfair competition case" but "the accounting for profits in such circumstance is not *in lieu of* damages, but is *a method of computing* damages." *Id.* There must be "some approximate relation of correspondence, a causal relation not wholly unsubstantial and imaginary, between the gains of the aggressor and those diverted from his or her victim." *Id.* The goal of compensatory damages "is to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred." *Id.* at 307.

Damages in a misappropriation action "must be measured by the loss of the *plaintiff*'s commercial advantage, which may not correspond to what the defendant has wrongfully gained." *Id.* at 308. "[W]hile a defendant's gains may be evidence of a plaintiff's losses, they will not be presumed to be the actual measure of a plaintiff's losses. Otherwise, damages would cease to serve the compensatory goals of tort recovery." *Id.* at 310. "[T]he measure of damages in a trade secret action must be designed, as nearly as possible, to restore the plaintiff to the position it would have been in but for the infringement. Whether those losses are measured by the defendant's profits, revenues, cost savings or any other measure of unjust gain, there is no presumption of law or of fact that such a figure will adequately approximate the losses incurred by the plaintiff." *Id.* "[D]amages in trade secret actions must be measured by the losses incurred

---

concept of a reasonable royalty award for misappropriation cases [under New York law] where measuring either defendant's profits or the plaintiff's losses is too hard or speculative, it did so prior to the New York Court of Appeals' decision in *E.J. Brooks* [*II*]." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 398 n.30 (S.D.N.Y. 2023) (precluding plaintiff from seeking a reasonable royalty based entirely on plaintiff's development costs as damages for its New York misappropriation claim). This acknowledges the possibility that *E.J. Brooks II* might have implicitly eliminated reasonable royalty awards as a form of compensatory damages in New York trade secret cases. This Opinion does not need to decide that issue in order to resolve the present motion.

by the plaintiff" and "damages may not be based on the infringer's avoided development costs." *Id.* at 311.

The implication of *E.J. Brooks II* as applied to the present case is clear: whether labeled as "unjust enrichment," as "a reasonable royalty" or as any other flavor of compensatory damages, those damages must be congruent with the actual losses incurred by the plaintiff. Avoided development costs do not necessarily correlate to that injury. "Where disclosure of a trade secret has destroyed [the secret's] competitive edge" -- something both parties acknowledge has not happened here -- "the plaintiff's costs of developing the product may be the best evidence of the (now-depleted) value that the plaintiff placed on the secret." *Id.* at 311. But the focus of the inquiry is still on the injury itself, for which development costs can, in circumstances not applicable here, provide an effective proxy.

*E.J. Brooks II* spoke explicitly to unjust enrichment, not to reasonable royalty awards. But to permit a reasonable royalty award premised entirely on avoided development costs "would circumvent the Court of Appeals' holding in *E.J. Brooks [II]*." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 398 n.30 (S.D.N.Y. 2023) (New York law). Such a holding would mean that any party hoping to recover damages based on avoided development costs need only present its damages theory as one of "reasonable royalty" to side-step the bedrock principle that compensatory damages "restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred." *E.J. Brooks II*, 105 N.E.3d at 307.

Here, a reasonable royalty is not an appropriate measure of damages because it does not "restore the plaintiff to the position it would have been in but for the infringement." *Id.* at 310. As the Second Circuit observed in the instant case, Syntel's misappropriation did not injure TriZetto beyond its actual loss of $8.5 million in lost profits. *Syntel*, 68 F.4th at 810-11. The trial

evidence showed that Syntel's misappropriation did not diminish the value of the trade secrets or impair TriZetto's ability to use them. The permanent injunction entered after trial prevents Syntel's continued use or destruction of TriZetto's trade secrets, some of which are now worth more than they were at the time of the misappropriation. *Id.* at 811.

At trial, TriZetto's damages expert, Thomas Britven, testified that a hypothetical negotiation between TriZetto and Syntel would yield a royalty that apportioned half of TriZetto's development costs to Syntel. But he provided no basis for a jury to infer that his suggested royalty amount bore any relation to the injury TriZetto suffered from Syntel's relatively limited infringing use. Accordingly, the $142,427,596 awarded under New York law would entitle TriZetto to a windfall far in excess of any injuries demonstrated at trial and is vacated.

### 2. Copyright Claim Award

The $59,100,000 awarded under the Copyright Act is also vacated. In its supplemental briefing, TriZetto did not separately address the jury's damages award under the Copyright Act, explaining that "[t]he copyright infringement award is subsumed within the New York trade secret misappropriation damages award." The statement reflects TriZetto's view that a Copyright Claim royalty would not be awarded in addition to a New York Claim royalty because that, in some sense, would be double counting. TriZetto's statement also apparently concedes that if a royalty award on the New York Claim is rejected, a similar royalty award on the Copyright Claim would likewise be rejected. The Court agrees. For the reasons above, the jury's damages award on the Copyright Claim based on a "reasonable royalty" is improper in this case.

In addition, the Copyright Claim award is rejected because of insufficient evidence. The owner of a copyright that has been infringed "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable

to the infringement and are not taken into account in computing the actual damages." 17 U.S.C.
§ 504(b). An award of actual damages "undertakes to compensate the owner for any harm he
suffered by reason of the infringer's illegal act." *On Davis v. Gap, Inc.*, 246 F.3d 152, 159 (2d
Cir. 2001); *accord Juliff v. Headout, Inc.*, No. 20 Civ. 699, 2021 WL 3887764, at *2 (S.D.N.Y.
Aug. 31, 2021). Such damages include "the market value of the fee the owner was entitled to
charge" for the defendant's use. *On Davis*, 246 F.3d at 165. The question for the court "is not
what the owner would have charged, but rather what is the fair market value." *Id.* at 166. To
calculate this "fair market value," a court must determine "the reasonable license fee on which a
willing buyer and a willing seller would have agreed for the use taken by the infringer." *Id.* at
167.

In this case, the infringing use by Syntel was limited. It involved servicing a single client,
from which Syntel earned $27 million in revenue, of which $823,899 was profit. No reasonable
fact finder would conclude that $59,100,000 is a reasonable licensing fee for this use. Nor did
TriZetto's damages expert present evidence sufficient to establish the fair market value of a
hypothetical license to service a single customer, for example by analogizing to benchmark
agreements reached between similarly situated parties for the purchase of comparable rights. *See
United States v. Broad. Music, Inc.*, 316 F.3d 189, 194 (2d Cir. 2003); *accord Broad. Music, Inc.
v. N. Am. Concert Promoters Ass'n*, 664 F. Supp. 3d 470, 478 (S.D.N.Y. 2023). Instead, the
Copyright Claim award proposed to and accepted by the jury is 50% of TriZetto's development
costs for the trade secrets subject to copyright. TriZetto's expert provided no evidence or
explanation that the royalty rate approximated TriZetto's actual losses.

### B.  Attorney's Fees

TriZetto seeks attorney's fees of $14,548,992.98.  The motion is granted.  Because attorney's fees are dependent on the unique facts of each case, the district court has "considerable discretion in determining what constitutes reasonable attorney's fees."  *Holick v. Cellular Sales of N.Y., LLC*, 48 F.4th 101, 105 (2d Cir. 2022).  "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *accord Vogelmann v. Comm'r of Soc. Sec.*, 15 Civ. 8717, 2021 WL 6127077, *2 (S.D.N.Y. Dec. 28, 2021).  To determine the appropriate attorney's fees award, courts calculate the "lodestar," which "is derived by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate."  *H.C. v. N.Y.C. Dep't of Educ.*, 71 F.4th 120, 126 (2d Cir. 2023).  The most critical factor in a district court's determination of what constitutes reasonable attorney's fees in a given case is the degree of success obtained by the party requesting fees.  *See Farrar v. Hobby*, 506 U.S. 103, 114 (1992); *accord Rothman v. City of New York*, No. 19 Civ. 225, 2020 WL 7022502, at *2 (S.D.N.Y. Nov. 30, 2020).

### 1.  Entitlement to Fees

TriZetto is entitled to attorney's fees.  Under the DTSA, the court may "award reasonable attorney's fees to the prevailing party" if "the trade secret was willfully and maliciously misappropriated."  18 U.S.C. § 1836(b)(3)(D).  The jury was instructed that, to award punitive damages, they must "find that a party has proven by a preponderance of the evidence the other party's conduct was malicious and wanton, and not merely unreasonable," meaning that the liable party "acted with deliberate intent to injure or interfere with the [prevailing] party's rights and with conscious indifference and utter disregard of its effect on the safety and rights of others."

9

By awarding punitive damages against Syntel, the jury necessarily found that Syntel's conduct was malicious and wanton.  The Court similarly determined that "Syntel's conduct was reprehensible," a conclusion based in part on TriZetto's "evidence that Syntel acted willfully." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 Civ. 211, 2021 WL 1553926, at *9 (S.D.N.Y. Apr. 20, 2021) (remitting the punitive damages award).  These findings unequivocally satisfy the DTSA's requirement that a trade secret be "willfully and maliciously misappropriated" to justify an award of attorney's fees.  18 U.S.C. § 1836(b)(3)(D).

Syntel does not dispute that the DTSA authorizes attorney's fees in this instance.  Instead, it argues that an award of attorney's fees under the DTSA is discretionary even where malicious and willful misappropriation have been proved and that the Court, in its discretion, should deny the motion.  While a grant of attorney's fees under the DTSA is discretionary, Syntel does not persuasively argue that they should not be awarded here.  Syntel cites cases for the unremarkable proposition that a finding of malice and willfulness does not *require* an award of attorney's fees under the DTSA or comparable statutes.  That some courts have declined to award attorney's fees under similar discretionary provisions has no bearing on whether fees are appropriate under the circumstances here.  Syntel next attempts to read into the DTSA a requirement that attorney's fees be awarded only where they may serve to deter future misconduct.  The statute contains no such requirement, and the cases Syntel points to do not hold otherwise.  Nor is Syntel's "conduct during the litigation" a relevant datapoint in assessing whether an award of attorney's fees is appropriate.  The statute looks to the willfulness and maliciousness of the conduct underlying the substantive claim -- i.e., the misappropriation of trade secrets -- not to the liable party's conduct during the litigation.  And even if conduct during litigation were a relevant consideration, it is

doubtful that Syntel, which "[d]uring discovery, . . . destroyed documents and computers" and was subject to a preclusion order, could marshal much favor there.  *See Syntel*, 68 F.4th at 797.

The parties dispute whether the Copyright Act affords an independent basis to award attorney's fees.  Under the Copyright Act, a district court "may . . . award a reasonable attorney's fee to the prevailing party."  17 U.S.C. § 505.  The word "may" in § 505 "clearly connotes discretion."  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994); *accord Boesen v. United Sports Publ'ns, Ltd.*, No. 21-1029-CV, 2022 WL 457281, at *1 (2d Cir. Feb. 15, 2022) (summary order).  Several factors inform the exercise of that discretion.  First, the district court must make a "particularized, case-by-case assessment."  *Boesen*, 2022 WL 457281, at *1.  Second, the court "may not treat prevailing plaintiffs and prevailing defendants any differently."  *Id.*  Third, the court should consider "several nonexclusive factors" including "frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.*  "[O]bjective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted."  *Matthew Bender & Co. v. W. Publ'g Co.*, 240 F.3d 116, 122 (2d Cir. 2001); *accord Brunswick Recs. Corp. v. Lastrada Ent. Co.*, No. 23 Civ. 100, 2023 WL 8703705, at *3 (S.D.N.Y. Dec. 15, 2023).

Syntel argues that it raised a good-faith defense as to whether TriZetto's Data Dictionary was even subject to copyright, and that attorney's fees should be disallowed under the Copyright Act as Syntel's arguments in litigation were not objectively unreasonable.  But because fees are proper under the DTSA, it is unnecessary to decide whether the Copyright Act provides an independent channel for the recovery of fees.  The Second Circuit has held that "[i]n fixing the lodestar the court may exclude any hours spent on severable unsuccessful claims."  *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004); *accord Sanchez v. Oceanside First Class Roofing, Inc.*,

818 F. App'x 106, 108 (2d Cir. 2020) (summary order).  But where the claims "involve a

common core of facts or are based on related legal theories, and are therefore not severable,

attorney's fees may be awarded for unsuccessful claims as well as successful ones."  *Green*, 361

F.3d at 98.  This logic -- recognizing that claims "can be intertwined based on common facts as

well as common legal theories" -- would seem to apply with even greater force in a case like this

where the party seeking fees has prevailed on all, not just some, of its related claims.  *See id.* at

98 n.2.

      Claims are intertwined when they are based on a "common core of facts" or "related legal

theories" or when they "require[] essentially the same proof."  *Kerin v. U.S. Postal Serv.*, 218

F.3d 185, 194 n.6 (2d Cir. 2000); *accord Sanchez*, 818 F. App'x at 108.  Here, the claims are all

based on the misappropriation of TriZetto's intellectual property by Syntel.  These claims are

sufficiently intertwined to permit recovery of fees for work relating to the Copyright Claim under

the DTSA's fees provision.

      **2.  Fees Calculation**

        **a.  Reasonable Hourly Rate**

      A reasonable hourly rate is "what a reasonable, paying client would be willing to pay,

given that such a party wishes to spend the minimum necessary to litigate the case effectively."

*Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009); *Zhang v. Zhang*, No. 16 Civ.

4013, 2021 WL 1154084, at *2 (S.D.N.Y. Mar. 26, 2021).  The rate must be "in line with

prevailing rates in the community for similar services by lawyers of reasonably comparable skill,

expertise and reputation."  *McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA*

*Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006); *accord Trs. of the N.Y.C. Dist. Council of*

*Carpenters Pension Fund v. Piccini MNM, Inc.*, 19 Civ. 5258, 2021 WL 1791591, *4 (S.D.N.Y.

May 5, 2021).  A court should consider the *Johnson* factors[5] to help determine "what rate a paying client would be willing to pay."  *Lilly v. City of New York*, 934 F.3d 222, 239-30 (2d Cir. 2019).  A court does not need to make specific findings as to each factor as long as all are considered.  *See, e.g.*, *R.G. v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 6851, 2019 WL 4735050, at *2 (S.D.N.Y. Sept. 26, 2019).

All of the *Johnson* factors noted above have been considered, including the following: the rates here range from $585 for junior attorneys up to $1,765 for lead attorneys.  These are reasonable rates given the rates typically charged for similar services by lawyers of comparable skill, expertise and reputation in this market.  Kirkland & Ellis is ranked among the best law firms for intellectual property litigation.  The litigation involved complex questions of intellectual property law, and the work involved was substantial.  In addition to the six-day trial, there were over 1,100 court filings, over 900,000 pages of documents produced, more than 156 hours of depositions and 1,966 trial exhibits.  "[F]or prevailing parties with private counsel, the actual billing arrangement is a significant, though not necessarily controlling, factor in determining what fee is reasonable."  *Crescent Publ'g Grp., Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 151 (2d Cir. 2001); *accord Kyros L. P.C. v. World Wrestling Ent., Inc.*, 78 F.4th 532, 549 (2d Cir. 2023).  TriZetto sought out experienced litigators for the work involved in this case and willingly paid the above-mentioned fees.  This billing arrangement also points to the fees' reasonableness.

---

[5] The *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Lilly v. City of New York*, 934 F.3d 222, 228 (2d Cir. 2019) (quoting *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

Syntel does not object to the hourly rates proposed.  Syntel correctly identifies several calculation errors contained in the original billing statement submitted by TriZetto.  TriZetto corrected these errors in a subsequent filing, explaining that a typographical error was to blame. This lowered the amount of attorney's fees sought by over $5 million, to $14,548,992.98.

### b.  Reasonable Hours Billed

"[A]ny attorney who applies for court-ordered compensation in this Circuit must document the application with contemporaneous time records specifying, for each attorney, the date, the hours expended, and the nature of the work done."  *Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 148 (2d Cir. 2014); *accord Brunswick Recs. Corp.*, 2023 WL 8703705, at *6. Before including time entries in the lodestar, a court must make "a conscientious and detailed inquiry" into the hours for which a party seeks reimbursement.  *Haley v. Pataki*, 106 F.3d 478, 484 (2d Cir. 1997); *accord Brunswick Recs. Corp.*, 2023 WL 8703705, at *6.  A court must "provide a concise but clear explanation of its reasons for the fee award."  *Hensley*, 461 U.S. at 437; *accord In re Petrobras Sec. Litig.*, 828 F. App'x 754, 759 (2d Cir. 2020) (summary order) (noting that *Hensley* does not require "a line-by-line accounting of every cost included or excluded from the fee award").  The court need not determine "whether attorney hours were necessary to the relief obtained" but simply whether, "at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures."  *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); *accord Harrington v. Kaushan Media Corp.*, No. 23 Civ. 3213, 2023 WL 8880311, at *6 (S.D.N.Y. Nov. 21, 2023).  Nonetheless, the court may exclude hours that are "excessive, redundant or otherwise unnecessary."  *H.C.*, 71 F.4th at 126.

TriZetto seeks fees for a reasonable number of hours billed.  TriZetto seeks only the subset of fees expended on the trade secret and copyright portions of the case, totaling

approximately 21,000 hours over seven years, including trial during the COVID-19 pandemic, and an appeal.  TriZetto does not seek to recover for time spent defending against Syntel's breach of contract, intentional interference with contract and misappropriation claims, or defeating Syntel's motion for preliminary injunctive relief at the beginning of the case.  Kirkland's records also exclude charges from twenty-nine of the fifty attorneys who worked on this matter and exclude charges for all of the paralegals and other administrative staff who billed time on this case.

Syntel makes several objections to the hours billed.  None is persuasive.  It objects that TriZetto's time entries include "repeated examples of the same timekeeper entering the same narrative in multiple time entries on the same day but with differing amounts."  But as TriZetto explains, this is a function of Kirkland's timekeeping system, which does not allow entries of more than fourteen hours in a single day.  Days in excess of fourteen hours were accordingly broken into several entries.  In particular, the entries to which Syntel objects all relate to work performed during the trial, when the workload was extremely high and attorneys often billed in excess of fourteen hours a day.  Syntel also objects to entries that are redacted or vague.  TriZetto responds that redactions conceal matters related to trade secret misappropriation and that "Trial prep," while vague, corresponds with the direct and cross-examinations performed by the attorney in question, Patricia Carson.  These hours appear reasonable and, in any case, the Court has no obligation to scrutinize a fee application line by line, *In re Petrobras Sec. Litig.*, 828 F. App'x at 760, but "is to do rough justice, not to achieve auditing perfection."  *Kyros L. P.C.*, 78 F.4th at 547.

Syntel finally objects that Trizetto is not entitled to fees for claims on which it did not prevail.  This too is unavailing.  Where a party "has achieved only partial or limited success, the

product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate

may be an excessive amount." *Hensley,* 461 U.S. at 436; *accord Raja v. Burns*, 43 F.4th 80, 87-

88 (2d Cir. 2022). "But the fee award should not be reduced simply because the plaintiff failed to

prevail on every contention raised in the lawsuit. Rather, the most critical factor is the degree of

success obtained." *Raja*, 43 F.4th at 88. "When a [party] has achieved partial success but the

[party's] claims involve a common core of facts or are based on related legal theories and are

therefore not severable, attorney's fees may be awarded for work done on unsuccessful claims as

well as successful ones." *Id.* "The court need not determine how much time counsel devoted to

each such overlapping claim but should instead look to the significance of the overall relief

obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*

Here, despite subsequent adverse rulings on the jury's damages awards, TriZetto achieved

substantial success on its trade secret and copyright claims. The jury found for TriZetto on every

issue presented, rejecting all of Syntel's defenses. TriZetto also succeeded in obtaining a

permanent injunction against Syntel's continued, unauthorized use of TriZetto's intellectual

property. The Second Circuit rejected Syntel's efforts to overturn the jury's findings on liability.

To attempt to pick apart TriZetto's fee calculation to omit any work related to TriZetto's damages

-- work that was inherently bound up in its liability arguments -- is a needless undertaking. The

overall relief obtained by TriZetto on its trade secret and copyright claims is significant, and

TriZetto is entitled to recover for the hours reasonably expended in that effort.

\* \* \* \* \*

The Court is mindful that the conclusion reached here is, in some respects, out of step

with courts' general deference to, and respect for, the judgment of the jury. *See Syntel*, 68 F.4th

at 800, 807 n.21. After hearing all of the evidence at trial, the jury spoke, awarding TriZetto the

largest amount of compensatory damages offered by TriZetto's expert, plus substantial punitive damages. These awards expressed the jury's clear view about the harm to TriZetto and the maliciousness of Syntel's conduct. Vacating the entirety of the jury's compensatory damages, which is where this case now stands, is in stark contrast to the jury's verdict. This result also deprives TriZetto of its lost profit damages of $8.5 million and, in effect, penalizes TriZetto for presenting a theory of damages that had yet to be addressed by the Second Circuit and had been accepted by the Seventh Circuit. *See Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1123 (7th Cir. 2020). Acknowledging that the jury's award was based on what now turns out to be legal error, the Court is compelled to vacate the jury's remaining compensatory damages awards.

## IV.    CONCLUSION

The remaining compensatory damages judgments entered in this case -- (1) the $142,427,596 New York trade secret misappropriation award and (2) the $59,100,000 copyright infringement award -- are **VACATED**. TriZetto's motion for attorney's fees in the amount of $14,548,992.98 is **GRANTED**. Entry of an amended judgment is stayed until **April 30, 2024**, so that the parties may (1) discuss a possible resolution and (2) file any follow-on motions.

The Clerk of Court is respectfully directed to close the motion at Dkt. 1104.

Dated:  March 13, 2024
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

17

# EXHIBIT 4

rise to the defense of full repudiation of the contract. J. App'x 1189-90, ¶¶ 70-73. Conspicuously, neither he nor Equitas cite a case reaching that result, which would in any event sit in some tension with English law's rejection of a partial repudiation defense.

[12] Even accepting for a moment the expert's proposed standard, however, the facts that Equitas alleges – that ICSOP notified Equitas some six years after becoming aware that a claim was likely under the reinsurance policy, that ICSOP failed to inform Equitas of the likely claim in response to queries about other claims, and that some of ICSOP's failures may even have been deliberate – do not suffice to show serious prejudice. Equitas's expert defined serious prejudice as something that goes to the "root of the whole" contract. *Id.* at 1189-90, ¶¶ 68, 72. We see none of that in this record, and thus no reason to go where no English court has gone. Accordingly, we agree with the district court that Equitas's late-notice defense is unavailing.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.



SYNTEL STERLING BEST SHORES MAURITIUS LIMITED, Syntel, Inc., Plaintiffs-Counter-Defendants-Appellants,

v.

THE TRIZETTO GROUP, INC., Cognizant Technology Solutions Corp., Defendants-Counter-Claimants-Appellees.†

**Docket No. 21-1370**
**August Term 2022**

United States Court of Appeals,
Second Circuit.

Argued: September 19, 2022

Decided: May 25, 2023

**Background:** Subcontractor retained by software developer to provide customization and implementation consulting services to clients using its software product, which automated and managed common healthcare administrative tasks, brought action against developer for breach of their master services agreement (MSA), misappropriation of confidential information, and intentional interference with contractual relations, after competitor acquired developer and hired subcontractor's employees to perform work on product it supported. Developer counterclaimed for misappropriation of trade secrets related to the product, in violation of the Defend Trade Secrets Act (DTSA) and New York law, and copyright infringement. After jury returned a verdict in favor of developer on all counts and awarded compensatory and punitive damages, the United States District Court for the Southern District of New York, Lorna G. Schofield, J., 2021 WL 1553926, denied subcontractor's motions for judgment as a matter of law (JMOL) and for a new trial, but granted in

---

† The Clerk of the Court is directed to amend the official caption as set forth above.

SYNTEL STERLING BEST SHORES v. THE TRIZETTO GROUP  793
Cite as 68 F.4th 792 (2nd Cir. 2023)

part its motion for remittitur. Subcontractor appealed.

**Holdings:** The Court of Appeals, Wesley, Senior Circuit Judge, held that:

(1) sufficient evidence supported jury's finding that developer's software code, scripts, and framework for updating database of product were trade secrets;

(2) sufficient evidence supported jury's finding that developer's tools were trade secrets;

(3) sufficient evidence supported jury's finding that developer's manuals and guides were trade secrets;

(4) deletion of non-competition provision in amended MSA did not authorize subcontractor to use developer's trade secrets to compete with developer;

(5) developer was not entitled to avoided costs as a form on unjust enrichment damages; and

(6) remand was warranted for the district court to address the propriety of two jury awards based on developer's damages theory of awarding a reasonable royalty.

Affirmed in part, vacated in part, and remanded.

**1. Federal Courts** ⟳**3605, 3672**

Court of Appeals reviews de novo district court's decision on motion for judgment as matter of law (JMOL), considering evidence in light most favorable to nonmoving party and giving that party benefit of all reasonable inferences that jury might have drawn in that party's favor from evidence. Fed. R. Civ. P. 50(b).

**2. Federal Courts** ⟳**3605**

Court of Appeals, in reviewing a ruling on a motion for judgment as a matter of law (JMOL), applies the same standard

that is required of the district court. Fed. R. Civ. P. 50(b).

**3. Federal Courts** ⟳**3605**

Court of Appeals affirms the denial of a motion for judgment as a matter of law (JMOL) unless there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it. Fed. R. Civ. P. 50(b).

**4. Federal Civil Procedure** ⟳**2608.1**

The movant's burden in a motion for judgment as a matter of law is particularly heavy where the jury has deliberated in the case and actually returned its verdict. Fed. R. Civ. P. 50(b).

**5. Federal Courts** ⟳**3567**

Court of Appeals reviews legal questions de novo.

**6. Federal Courts** ⟳**3603(2)**

Court of Appeals reviews questions of fact for clear error.

**7. Antitrust and Trade Regulation** ⟳**428**

In a misappropriation of trade secrets action brought under the Defend Trade Secrets Act (DTSA) or New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity. 18 U.S.C.A. § 1836 et seq.

**8. Federal Courts** ⟳**3416(1)**

Court of Appeals may sua sponte review jury instructions and verdict sheets for fundamental error. Fed. R. Civ. P. 51.

**9. Federal Courts** ⟳**3395**

A "fundamental error," for purposes of appellate review, is so serious and fla-

grant that it goes to the very integrity of the trial.

> See publication Words and Phrases for other judicial constructions and definitions.

**10. Antitrust and Trade Regulation ⬮434**

**Federal Courts ⬮3416(1)**

Jury charges and verdict sheet identifying the specificity with which software developer had to identify the trade secrets it claimed its subcontractor misappropriated, in violation of the Defend Trade Secrets Act (DTSA) and New York law, did not compromise the very integrity of the trial, and thus were not fundamental error, where the precise contours of the specificity requirement in the context of trade secrets was "unsettled." 18 U.S.C.A. § 1836 et seq.; Fed. R. Civ. P. 51.

**11. Antitrust and Trade Regulation ⬮428**

In a misappropriation of trade secrets action brought under the Defend Trade Secrets Act (DTSA) or New York law, the requirement that a plaintiff identify a purported trade secret with sufficient specificity serves to place the defendant on notice of the bases for the claim against it. 18 U.S.C.A. § 1836 et seq.

**12. Antitrust and Trade Regulation ⬮433**

In a misappropriation of trade secrets action brought under the Defend Trade Secrets Act (DTSA) or New York law, the existence of a trade secret, including whether it was adequately identified, is a fact-specific question to be decided on a case-by-case basis. 18 U.S.C.A. § 1836 et seq.

**13. Antitrust and Trade Regulation ⬮432**

Sufficient evidence supported jury's finding that software developer's software code, scripts, and framework for updating database of software product, which automated and managed common healthcare administrative tasks, were trade secrets, at trial on developer's claim against subcontractor, retained to provide customization and implementation consulting services to clients using developer's product, for misappropriation of trade secrets, in violation of the Defend Trade Secrets Act (DTSA) and New York law; developer's fact witness explained what each trade secret did, how it was developed, the necessary and very important competitive advantage each piece of software provided to developer's customers' businesses, and steps that were taken to keep developer's applications confidential.

**14. Antitrust and Trade Regulation ⬮432**

Sufficient evidence supported jury's finding that software developer's tools, including its data dictionary, custom code impact tool, test cases, and automation scripts, for software product, which automated and managed common healthcare administrative tasks, were trade secrets, at trial on developer's claim against subcontractor, retained to provide customization and implementation consulting services to clients using developer's product, for misappropriation of trade secrets, in violation of the Defend Trade Secrets Act (DTSA) and New York law; developer's fact witness identified each tool trade secret by name, described how each tool operated in detail, tied the tools to specific documents, or source code, and testified that developer kept the tools confidential. 18 U.S.C.A. § 1836 et seq.

**15. Antitrust and Trade Regulation ⬮432**

Sufficient evidence supported jury's finding that software developer's manuals and guides for software product, which

SYNTEL STERLING BEST SHORES v. THE TRIZETTO GROUP **795**
Cite as 68 F.4th 792 (2nd Cir. 2023)

automated and managed common healthcare administrative tasks, were trade secrets, at trial on developer's claim against subcontractor, retained to provide consulting services to clients using developer's product, for misappropriation of trade secrets, in violation of the Defend Trade Secrets Act (DTSA) and New York law; developer's fact witness testified that developer's manuals and guides detailed inner workings of the product and contained commercially valuable information that developer kept confidential, all of the manuals and guides were submitted into evidence, and expert presented several demonstratives linking the title of each manual or guide to specific exhibits. 18 U.S.C.A. § 1836 et seq.

**16. Contracts ⟲176(2)**

Under New York law, whether a contract is ambiguous is a question of law.

**17. Evidence ⟲2114**

Under New York law, courts may not resort to extrinsic evidence to aid in interpretation of a contract unless the contract is ambiguous.

**18. Contracts ⟲176(3)**
    **Evidence ⟲2114**

Under New York law, resolution of an ambiguous contract provision, for which extrinsic evidence may be used, is for the trier of fact.

**19. Antitrust and Trade Regulation ⟲420**

Under New York law, deletion of non-competition provision in amended master services agreement (MSA), between software developer and subcontractor retained to provide consulting services to clients using developer's software product, did not authorize subcontractor to use developer's confidential information and trade secrets to compete with developer; even if amended MSA had somehow implicitly changed the definition of "services" that subcontractor performed to include those that could leverage developer's confidential trade secrets, subcontractor was still obligated to abide by the MSA's confidentiality provisions, which prohibited subcontractor from commercially exploiting any of developer's data.

**20. Federal Courts ⟲3614(1)**

Amount of recoverable damages is a question of fact reviewed for clear error.

**21. Federal Courts ⟲3614(1)**

District court's understanding of whether avoided costs damages are proper under the Defend Trade Secrets Act (DTSA) is a legal question reviewed de novo. 18 U.S.C.A. § 1836 et seq.

**22. Antitrust and Trade Regulation ⟲437**

Courts take a "flexible and imaginative" approach to damages calculation in trade secret misappropriation cases that, in some instances, allows calculation of unjust enrichment damages based on avoided costs; "avoided costs" are the costs a trade secret holder had to spend in research and development that a trade secret misappropriator saves by avoiding development of its own trade secret.

See publication Words and Phrases
for other judicial constructions and
definitions.

**23. Antitrust and Trade Regulation ⟲437**

Software developer was not entitled to avoided costs as a form on unjust enrichment damages, in action against subcontractor, retained to provide consulting services to clients using developer's product, for misappropriation of trade secrets, in violation of the Defend Trade Secrets Act (DTSA); the $823,899 in unjust profits that subcontractor realized through its misappropriation were addressed in computing

damages for developer's actual loss, district court's permanent injunction ended subcontractor's use of developer's trade secrets, and therefore, its ability to profit from any avoided costs, and, subcontractor's misappropriation did not diminish, much less destroy, the secrets' continued commercial value to developer. 18 U.S.C.A. § 1836(b)(3)(B)(i)(II).

### 24. Federal Courts ⟺3788

Remand was warranted for the district court to address the propriety of two jury awards based on software developer's damages theory of awarding a reasonable royalty, specifically, the $142,427,596 New York trade secret misappropriation award and the $59,100,000 copyright infringement award, in action against subcontractor, retained to provide consulting services to clients using developer's product, for misappropriation of trade secrets, in violation of the Defend Trade Secrets Act (DTSA) and New York law, and copyright infringement; although the parties addressed the propriety of those awards in their motion papers below, there was nothing to appeal, since the jury, to avoid double counting, did not factor them into their total compensatory damages award.

### 25. Federal Courts ⟺3733

Both software developer and subcontractor that it retained to provide customization and implementation consulting services to clients using its software product waived appellate review of the propriety of the $142 million reasonable royalty award for subcontractor's misappropriation of developer's trade secrets under New York law; both parties addressed the propriety of the award only in a footnote on appeal.

KANNON K. SHANMUGAM, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC (Jaren Janghorbani, Nicholas P. Groombridge, Crystal L. Parker, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; J. Steven Baughman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, on the brief), for Plaintiffs-Counter-Defendants-Appellants.

JOHN C. O'QUINN, Kirkland & Ellis LLP, Washington, DC (Jason M. Wilcox, Hannah L. Bedard, Kirkland & Ellis LLP, Washington, DC; Michael W. De Vries, Kirkland & Ellis LLP, Los Angeles, CA; Adam R. Alper, Kirkland & Ellis LLP, San Francisco, CA; Leslie Schmidt, Kirkland & Ellis LLP, New York, NY, on the brief), for Defendants-Counter-Claimants-Appellees.

Before: RAGGI, WESLEY, and LOHIER, Circuit Judges.

WESLEY, Circuit Judge:

This is a tale of trade secrets.[1] The TriZetto Group, Inc. and Cognizant Technology Solutions Corporation (collectively, "TriZetto") develop software used by healthcare insurance companies. One software product is Facets®, a platform which automates and manages common healthcare administrative tasks such as claim processing, claim adjudication, and billing. TriZetto licenses its Facets software to healthcare insurance companies to manage services for over 170 million people in America. But installing, upgrading, and customizing Facets to fit a client's specific needs requires a significant amount of time and skilled personnel. As a part of its business, TriZetto also provides Facets

---

1. Citations to "App'x" refer to the Appendix, citations to "Special App'x" refer to Plaintiffs-Counter-Defendants-Appellants' Special Appendix, and citations to "Trial Tr." refer to portions of the trial transcript that do not appear in the Appendices.

SYNTEL STERLING BEST SHORES v. THE TRIZETTO GROUP      797
Cite as 68 F.4th 792 (2nd Cir. 2023)

customization and implementation consulting services to clients. TriZetto competes in this services market with third-party companies because it permits Facets customers to choose their service provider.[2]

Although TriZetto performs much of its own Facets related services, sometimes it utilizes subcontractors. One such subcontractor was Syntel Sterling Best Shores Mauritius Limited ("Syntel"). In 2010, TriZetto and Syntel entered into a Master Services Agreement ("MSA"). In exchange for a guaranteed annual payment from TriZetto, Syntel agreed to support Facets customers on TriZetto's behalf instead of competing with TriZetto for Facets services contracts. Under the MSA, TriZetto treated Syntel as a trusted business partner and gave Syntel's employees access to its trade secrets to perform Facets-related services for TriZetto.

TriZetto and Syntel enjoyed a cooperative relationship for much of their partnership, working together to outperform the Facets services competition. The relationship remained cooperative even after the parties' 2012 amendment to the MSA, which allowed Syntel to compete directly with TriZetto in the consulting services market ("Amended MSA").[3]

However, things began to sour in 2014 when Cognizant—Syntel's competitor—acquired TriZetto. As was its right, Syntel terminated the MSA and requested payment of rebates owed under the contract. In response, TriZetto refused to pay the rebates and raised concerns about Syntel continuing to use its confidential trade secrets post-termination.

Syntel filed suit against TriZetto in the Southern District of New York. Syntel's amended complaint alleged breach of the MSA, misappropriation of confidential information, and intentional interference with contractual relations, stemming from Cognizant hiring several Syntel employees to perform Facets work for TriZetto. TriZetto counterclaimed, alleging, as relevant here, that Syntel misappropriated trade secrets related to Facets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and New York law. TriZetto also asserted that Syntel infringed its copyrights.

During discovery, Syntel destroyed documents and computers. As a result, the district court ordered a neutral forensic examination of Syntel's digital electronic devices and files, which revealed that "Syntel was actively creating a repository of [TriZetto's] trade secrets on its own or of its own to be used in future work." App'x 336. Based on those findings, the district court entered a preclusion order to sanction Syntel for continued discovery misconduct ("Preclusion Order").[4] Citing

---

**2.** Depending on the terms of TriZetto's contract with each customer, a third-party provider can either (1) freely access TriZetto's materials through the customer or (2) enter into a separate contract directly with TriZetto—a so-called "third-party access agreement"—to gain access to TriZetto's materials for purposes of servicing the customer. In each case, the service provider is allowed to use TriZetto's guides, manuals, and other Facets materials for free.

**3.** In exchange for lowering TriZetto's payment commitment, the parties deleted a provision barring Syntel from competing for

Facets services contracts and "any other provision in the [MSA] related to [Syntel] being restricted from competing with TriZetto." App'x 613–14.

**4.** "The Preclusion Order barred Syntel from (1) 'offering or presenting any evidence that it did not misappropriate and unlawfully copy TriZetto's Facets test cases and automation scripts' and (2) 'offering or presenting any evidence that it independently developed any of the Platform Management Tools at issue in this case.' " Special App'x 3.

the Preclusion Order, the district court instructed the jury that Syntel had misappropriated 2 of the 104 claimed trade secrets—TriZetto's so-called "test cases" and "automation scripts." App'x 2131. Syntel does not appeal the Preclusion Order.

At trial, TriZetto elected to proceed with misappropriation counterclaims on its Facets trade secrets, which TriZetto characterized as falling into three categories: (1) software; (2) tools; and (3) guides and manuals. Syntel did not contest that it downloaded and used the trade secrets. It instead framed the entire case as about "what use was proper or improper." App'x 387. Its central theme was that the Amended MSA authorized Syntel to compete for Facets services business while using TriZetto's trade secrets.

With respect to damages, TriZetto presented expert testimony indicating Syntel avoided expending roughly $285 million in research and development costs through its misappropriation. This is not the full amount that TriZetto spent on research and development to make Facets; that is over $500 million. As TriZetto's damages expert testified at trial, the $285 million figure represented a portion of the overall research and development costs, specifically, those costs for the period between 2004 to 2014, excluding client-funded research and development. The record does not reflect the reason that the $285 million figure was so limited. The expert also testified that TriZetto lost $8.5 million in profits, based on a Facets software upgrade Syntel performed for United Health Group ("UHG") using TriZetto's trade secrets.

The district court charged the jury on "several types of compensatory damages that could be available to TriZetto for its trade secret misappropriation claims:" (1) TriZetto's lost profits, (2) Syntel's unjust enrichment, and (3) "reasonable royalty"

damages, which were available "[a]s an alternative to lost profits or unjust enrichment." Trial Tr. 867:17–19, 869:8–9. As to unjust enrichment, the district court instructed:

> Unjust enrichment is the amount that Syntel benefited as a result of any misappropriation. One form of unjust enrichment can be measured by accounting for the infringer's profits earned by using the trade secrets, when such profits can be proven. An alternative form of unjust enrichment is called *avoided costs*. Avoided costs may be considered only for TriZetto's federal misappropriation claim, and not for its state misappropriation claim. Avoided costs are the amount that Syntel would have incurred to achieve the same result without the use of the appropriated trade secret.

App'x 529 (868:13–23) (emphasis added).

In summation, TriZetto's lawyer noted that it had introduced an expert avoided costs estimate of roughly $285 million, while Syntel had offered none. TriZetto's lawyer emphasized that this amount was "much less than the overall price of the development" and was "only a tiny fraction of the overall money that [Syntel] hoped to make." Trial Tr. 907:2–6. TriZetto's lawyer was referring to evidence suggesting Syntel's goal was to make $1 billion with TriZetto's trade secrets.

Meanwhile, Syntel's lawyer characterized TriZetto's avoided costs request as an effort to "crush[ ] a potential competitor" that bore no rational relation to actual damages. *Id.* at 938:21. Syntel's lawyer repeatedly emphasized the lack of causal connection between the "actual infringing conduct" and TriZetto's avoided costs demand. *Id.* at 939:10–41:22. Syntel's lawyer argued several reasons why "[a]voided costs make no sense here:" (1) Syntel did not take or destroy the value of Facets; (2) Syntel could have used the same material

for "free" by obtaining a third-party access agreement from TriZetto; (3) "TriZetto still has the product" and "makes hundreds of millions of dollars a year licensing [it] out;" and (4) Syntel was just a competing services company—not a software company. *Id.* at 940:5–41:10.

In rebuttal, TriZetto's lawyer again emphasized that Syntel had offered no alternative to the $285 million figure and argued—incorrectly (though without objection)—that avoided costs damages are "what needs to be paid under the law when you violate the United States trade secret law." *Id.* at 954:7–10.

The jury returned a verdict for TriZetto on all counts. It found Syntel misappropriated TriZetto's trade secrets, violating both the DTSA and New York law, and that it infringed TriZetto's copyrights. To compensate for Syntel's misappropriation, the jury awarded TriZetto $284,855,192 in avoided development costs under the DTSA and $142,427,596 (one half that amount) as a "reasonable royalty" under New York law.[5] *Id.* at 907:14–17. The jury ultimately limited its award to $284,855,192 in compensatory damages and double that amount—$569,710,384—in punitive damages.[6]

After trial, Syntel renewed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and moved in the alternative for a new trial or remittitur under Federal Rule of Civil Procedure 59. Syntel made three arguments relevant

to this appeal. First, it argued that TriZetto failed to identify any trade secrets with the requisite specificity at trial. Second, it argued that there was no misappropriation because the Amended MSA authorized Syntel to use 102 of the 104 TriZetto trade secrets at issue. Third, it argued that DTSA avoided costs damages were improper in this case as a matter of law.

The district court denied Syntel's post-trial motions but remitted the punitive damages award to $284,855,192, which TriZetto accepted. The district court also entered a permanent injunction that, with two exceptions not relevant here, enjoins Syntel from using any of the 104 trade secrets going forward. Syntel does not challenge the injunction. This appeal followed.

## DISCUSSION

Syntel challenges the judgment's liability finding in two ways. First, it argues the district court applied the wrong legal standard for identifying a trade secret with specificity. Syntel contends that had the court applied the correct standard, no reasonable jury could have found the existence of any trade secret on the evidence TriZetto presented at trial. Second, Syntel argues that even if TriZetto adequately identified the alleged trade secrets, the district court erred in its understanding of the Amended MSA. To Syntel, the Amended MSA unambiguously authorized its use

---

**5.**  The jury separately awarded TriZetto $59,100,000 for copyright infringement, unchallenged on appeal.

**6.**  The jury limited its compensatory damages award in response to Question 11 on the verdict form: "Being mindful of not awarding damages that result in double or multiple recovery for the same injury, what is the total amount of compensatory damages, if any, TriZetto is entitled to receive from Syntel in light of your answers to the previous three

questions?" App'x 2254. With respect to the $8.5 million in lost profits, TriZetto took the view that awarding lost profits and avoided costs would constitute "double counting" under the DTSA; the district court accepted that view. Special App'x 15. As a result, the verdict form that TriZetto proposed and the district court accepted did not ask the jury to determine if (and to what amount) TriZetto was entitled to lost profit damages.

of 102 of the 104 alleged trade secrets, such that there is no misappropriation as a matter of law. Syntel separately challenges the damages award, arguing the district court erred in allowing avoided costs as permissible unjust enrichment damages under the DTSA in this specific case.

### I. Standard of Review.

**[1, 2]** We review the denial of a Rule 50(b) motion *de novo*, "considering the evidence in the light most favorable to the non-moving party and giving that party the benefit of all reasonable inferences that the jury might have drawn in that party's favor."[7] *Triolo v. Nassau Cnty.*, 24 F.4th 98, 105 (2d Cir. 2022). In other words, we apply the same standard as the district court. *See id.*

**[3–6]** A district court may grant judgment as a matter of law only if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party." FED. R. CIV. P. 50(a)(1). We affirm the denial of a Rule 50(b) motion "unless there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Ashley v. City of New York*, 992 F.3d 128, 138–39 (2d Cir. 2021). This standard presents a "particularly heavy" burden for Syntel, where, as here, "the jury has deliberated in the case and actually returned its verdict" in favor

of the non-movant. *Triolo*, 24 F.4th at 105. Further, "[i]t is an axiom of appellate procedure that we review legal questions *de novo* and questions of fact for clear error." *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013).

### II. Liability.

Syntel first argues no reasonable jury could have found for TriZetto on the trade secret misappropriation claims because TriZetto inadequately specified each asserted trade secret as a matter of law. But whether TriZetto's trade secrets were adequately identified (and proved) was ultimately a question for the jury. While presented as a legal challenge, Syntel's argument really attacks the sufficiency of the evidence supporting the jury's verdict. Because Syntel cannot show a "complete absence of evidence supporting" the jury's findings, they survive the challenge. *Ashley*, 992 F.3d at 138–39.

Syntel separately argues that the Amended MSA unambiguously authorized Syntel to use 102 of the 104 TriZetto trade secrets at issue.[8] Whether framed as a legal issue regarding the contract's interpretation or a factual issue based on extrinsic evidence, we conclude Syntel's argument comes up short.

### A. TriZetto Adequately Identified its Trade Secrets at Trial.

**[7–12]** Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity.[9] *See InteliClear, LLC*

---

**7.** Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

**8.** As mentioned above, the two remaining claimed trade secrets were the subject of the district court's Preclusion Order; as a result,

the jury was directed to find misappropriation as to those alleged secrets.

**9.** Although this Court "has not squarely articulated the precise contours of the specificity requirement in the context of trade secrets," *Next Commc'ns*, 758 F. App'x at 49 n.3, we decline to do so here. Our review in this

*v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020) (DTSA); *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 48–49 (2d Cir. 2018) (New York law). The specificity requirement "place[s] a defendant on notice of the bases for the claim being made against it," *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021), and allows a factfinder to determine whether certain information is, in fact, a trade secret. *See* Restatement (Third) of Unfair Competition § 39 cmt. d (characterizing purpose of specificity requirement as permitting determination of "fact of an appropriation"); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002) (observing that, if plaintiff fails to separate "trade secrets from the other information that goes into any software package," the court "cannot do its job" at summary judgment). The existence of a trade secret, including whether it was adequately identified, is "a fact-specific question to be decided on a case-by-case basis." *Oakwood Labs.*, 999 F.3d at 906; *see Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962) ("An exact definition of a trade secret is not possible.") (quoting Restatement (First) of Torts § 757 cmt. b). Thus, although the parties press for a general specificity rule, we need not and do not articulate such a rule today.

Viewing the evidence adduced at trial in the light most favorable to TriZetto, a reasonable jury could have determined the asserted trade secrets were in fact trade secrets. TriZetto's witnesses, including its fact witness Mr. Noonan and its technical expert Dr. Bergeron, provided extensive testimony identifying and describing the trade secrets. For each trade secret, Noonan explained (1) what the secret was, (2) how the secret was developed, (3) the value of the secret to TriZetto, and (4) that the secret was maintained as confidential. The jury was provided, for its viewing, a court exhibit—jointly submitted by the parties—listing each asserted trade secret by name. Moreover, Dr. Bergeron presented several demonstratives linking the title of each individual trade secret to specific exhibits. These demonstratives listed the name, exhibit numbers, and general category for each asserted trade secret. Finally, the jury received the documents or source code tied to the asserted secrets.

### 1. Software Trade Secrets (Nos. 1–3).

[13] We begin with TriZetto's three asserted software trade secrets: (1) the Facets software code, (2) TriZetto's DBBLD scripts, and (3) the framework for updating the Facets database.

After providing the jury a thorough overview of Facets' functionality, Noonan discussed the database tables and claim data model at "the heart of Facets." App'x 247 (88:16–19). At a high level, these tables and the data model convey the architecture of the Facets software. Noonan

---

appeal is limited to examining the sufficiency of the evidence supporting the jury's verdict. Syntel does not argue that the district court's instruction or verdict sheet were deficient but instead elects to bring a sufficiency challenge. *See* Oral Arg. at 3:38–4:16. *See generally* Syntel Br. at 18–37 (nowhere arguing error in jury instructions or verdict sheet). Although Syntel has not requested that we do so, we may review jury instructions and verdict sheets for "fundamental error" in accordance with FED. R. CIV. P. 51. *See Kotler v. Jubert*, 986

F.3d 147, 158 n.38 (2d Cir. 2021). "Fundamental error" is "so serious and flagrant that it goes to the very integrity of the trial." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 49 (2d Cir. 2015). Because the precise contours of the specificity requirement in the context of trade secrets is "unsettled," we conclude that the jury charges and verdict sheet in this case did not compromise "the very integrity of the trial" and thus were not fundamental error. *See id.* at 49–50.

showed the jury depictions of TriZetto's claim tables and confirmed to the jury that the data model and the rest of Facets' internal computer architecture is "ke[pt] confidential." App'x 246 (87:5–24). He then described the DBBLD scripts and upgrade framework software. Noonan detailed what each software application does, the "necessary and very important" competitive advantage each piece of software provides to its customers' businesses, App'x 254–56 (115:6–117:15), and the steps TriZetto takes to keep the applications confidential. TriZetto then introduced the source code for all three of the software trade secrets into evidence.

Viewing the evidence in the light most favorable to TriZetto, a reasonable jury could have determined that the asserted software trade secrets were in fact trade secrets. Noonan identified the trade secrets by name, described them in detail, tied them to specific documents or source code, and communicated that TriZetto kept them confidential.

**2. Tools Trade Secrets (Nos. 4, 102–104).**

[14] For the same reasons, we find TriZetto presented sufficient detail about its four asserted tools trade secrets: the (1) Data Dictionary, (2) Custom Code Impact Tool, (3) test cases, and (4) automation scripts. Noonan also identified TriZetto's tools trade secrets by name, described

them in detail, tied them to specific documents or source code, and testified that TriZetto kept them confidential.

For example, Noonan not only described how the Data Dictionary operates, but also the confidential window it opens into "th[e] data structure that [TriZetto] built at the heart of Facets."[10] App'x 259 (120:4–7). Further, the jury heard it "would be damaging" to TriZetto if "the Data Dictionary was copied by a competitor and used for an unauthorized purpose." App'x 261 (122:11–17).

With respect to the Custom Code Impact Tool, Noonan described what the tool does, explained how it benefits customers, and confirmed TriZetto keeps its source code confidential "as a trade secret." App'x 261–63 (122:22–124:19). The source code for both the Data Dictionary and the Custom Code Impact Tool were admitted into evidence.

Noonan separately addressed the test cases and automation scripts trade secrets.[11] Those trade secrets, he explained, contain detailed instructions about how to test Facets after an installation or upgrade. The jury also heard that these trade secrets are not generic items generally known in the field—Noonan testified that TriZetto has "been building these with Facets [ ] over the course of Facets' life" and that they are completely confidential.[12] App'x 266–67 (127:24–128:2).

---

10. Unlike situations where significant aspects of the trade secrets are publicly known or where versions of the trade secrets are used by others in the industry, the jury heard that Noonan, in his 30 years of experience, has never "seen anything like the Facets Data Dictionary out in the world" and would not "expect to see the Data Dictionary software code or the documents describing it out in the public" domain. App'x 261 (122:1–10).

11. The Preclusion Order did not relieve TriZetto of its burden of proving that both of the items were, in fact, trade secrets.

12. While showing the jury a cover page for a Facets test, TriZetto's lawyer asked Noonan if there was "anything in [the] document that shows that TriZetto keeps this document confidential and that it believes it's its trade secret information." App'x 264 (124:1–18). Noonan alerted the jury to a copyright notice on the page reading: "confidential and proprietary." *Id.* at 124:19–23.

Noonan then illustrated a test case—showing the jury a specific case for processing a claim and explaining the steps it performs. The test cases and automation scripts were also admitted into evidence as confidential exhibits.

As before, viewing the above evidence in the light most favorable to TriZetto, we conclude that a jury could have reasonably determined that the asserted tools trade secrets were in fact trade secrets.

### 3. Manuals and Guides Trade Secrets (Nos. 5–101).

**[15]** Syntel takes special aim at the jury's finding that TriZetto sufficiently identified its 97 asserted manuals and guides trade secrets. In the procedural context before us, TriZetto produced sufficient evidence at trial to affirm the jury's findings.

For example, the jury heard testimony that TriZetto's manuals and guides differ meaningfully from those accompanying "off-the-shelf software." App'x 267 (128:12–15). Noonan testified that each manual and guide—in similar amounts of detail—dives deeply into "the inner workings of Facets" and the software's internal architecture. App'x 268 (129:6–17). He used the Data Model Guide as a representative example, showing the jury detailed architectural information on several of its pages.

Noonan also used the Data Model Guide as a representative example to demonstrate that all 97 manuals and guides comprise commercially valuable information that TriZetto keeps confidential.[13] Based on these identifications themselves, a jury

could have reasonably determined that the contents of each manual and guide amounted to protected trade secrets.

The parties also provided the jury with a jointly submitted list of TriZetto's 104 proposed trade secrets, which included the corresponding trade secret number and title for each. Dr. Bergeron presented several demonstratives linking the title of each individual manual or guide to specific exhibits. These demonstratives listed the name, exhibit numbers, and general category (*i.e.*, "Billing" or "Commissions") for each asserted manual or guide trade secret. TriZetto also submitted all 97 manuals and guides into evidence.

When all the above evidence, along with all the reasonable inferences that may be drawn from it, is viewed in the light most favorable to TriZetto, it constitutes sufficient support for the jury's determination that the asserted manuals and guides trade secrets were in fact trade secrets as well.

\* \* \*

Accordingly, we affirm the district court's denial of Syntel's Rule 50(b) motion on this issue.

### B. The Amended MSA Did Not Authorize Syntel to Use 102 of the 104 Claimed Trade Secrets.

Syntel separately argues that even if TriZetto met its burden to specify its 104 trade secrets, the district court erred in denying Syntel's Rule 50(b) motion for an independent reason: the Amended MSA unambiguously authorized Syntel's use of

---

**13.** For example, Noonan told the jury that TriZetto guards the Data Model Guide as "confidential [ ] property" because it "contains TriZetto's trade secrets." App'x 247 (88:9–12); 246 (87:18–22). The jury later learned that TriZetto keeps the other 96 manuals and guides confidential for similar rea-

sons. Noonan then described the commercial value of TriZetto's manuals and guides—explaining they are "very important" materials whose unauthorized use "would be damaging" to TriZetto's service business. App'x 268–69 (129:19–130:18).

102 of the 104 claimed trade secrets. We disagree.

The district court rejected Syntel's interpretation of the Amended MSA for two separate and independent reasons: (1) it is at odds with the unambiguous terms of the parties' agreements as a matter of law, and (2) even if the agreements were ambiguous, the jury considered and rejected Syntel's interpretation. According to Syntel, the district court improperly deferred to the jury on the legal issue of the interpretation of an unambiguous contract. Whether Syntel's argument is framed as a legal issue regarding the contract's interpretation or a factual issue based on extrinsic evidence, there is no basis to overturn the jury's findings that Syntel misappropriated TriZetto's trade secrets.

### 1. Applicable Law.

**[16–18]**  "New York law applies pursuant to the MSA." Special App'x 5 n.1. Under New York law, "[w]hether a contract is ambiguous is a question of law, and courts may not resort to extrinsic evidence to aid in interpretation unless the document is ambiguous." *Banos v. Rhea*, 25 N.Y.3d 266, 276, 11 N.Y.S.3d 515, 33 N.E.3d 471 (2015); *see also, e.g.*, *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465, 467 (2d Cir. 2010). On the other hand, "[t]he resolution of an ambiguous provision, for which extrinsic evidence may be used, is for the trier of fact." *Rhoda v. Rhoda*, 175 A.D.3d 1572, 1573, 110 N.Y.S.3d 35 (2d Dep't 2019).

### 2. Relevant Contractual Provisions.

Three provisions in the original MSA are relevant here. Sections 13.01 and 19.01 both impose confidentiality obligations on Syntel, preventing the use of any TriZetto trade secret without TriZetto's permission.

Under Section 13.01, Syntel agreed *not* to "use[ ]" TriZetto's intellectual property "other than in connection with providing the Services" under the agreement. App'x 659 (§ 13.01); 651 (§ 1.01(125)). "Services" is defined in the MSA to include certain enumerated categories of services and "any new services agreed to by the Parties to be provided by [Syntel] pursuant to this Agreement." App'x 650 (§ 1.01(99)) ("Services"); 653 (§ 3.02) ("Designated Services"). Those "Services" are only ones that TriZetto subcontracted with Syntel to provide. Syntel similarly agreed in Section 19.01 not to "use" or "disclose Confidential Information" without TriZetto's "prior consent." App'x 661–62 (§ 19.01); 647 (§ 1.01(13)) (defining "Confidential Information"). The third relevant provision is Section 29.17, a non-compete provision that prohibited Syntel from, among other things, competing with TriZetto for Facets services contracts.[14] App'x 604 (§ 29.17).

In 2012, the parties agreed to amend the MSA—Syntel lost its right to guaranteed revenue from TriZetto but gained the right to compete with TriZetto by billing directly for servicing Facets customers. To effect that change, the parties removed the non-compete provision in "Section 29.17 and any other provision in the Agreement related to [Syntel] being restricted from *competing* with TriZetto." App'x 613–14 (Art. 2(2)) (emphasis added).

### 3. Analysis.

**[19]**  The parties' dispute boils down to whether the deletion of the MSA's non-

---

**14.**  Specifically, "to prevent any misuse or disclosure of Confidential Information," Section 29.17 prohibited Syntel from "provid[ing] any products or services" that required "techni-cal, design, process or architectural knowledge of TriZetto's products or services relating to TriZetto's products." App'x 604 (§ 29.17).

competition provision authorized Syntel to use TriZetto's confidential information to compete with TriZetto. The district court correctly concluded the Amended MSA did no such thing. Syntel's view of the MSA in its altered format is that the agreement authorized Syntel to compete with TriZetto while TriZetto waived the *very thing* it values most.

The Amended MSA is unambiguous; Syntel was free to compete with TriZetto, but it was still obligated to abide by the MSA's confidentiality provisions. In the 2012 Amendment, the parties deleted the non-compete provisions in the MSA only so that Syntel could offer its own consulting services like any TriZetto competitor.

Syntel offers a rationale for the Amendment. Syntel first contends that by eliminating Section 29.17's restriction on competition, the Amended MSA "effectively expanded" the definition of "Services" to encompass any services Syntel performed "for third parties in competition with TriZetto." Syntel Br. 41–42. While Syntel's position finds no support in the Amendment's express provisions, Syntel argues no amendment to the definition of "Services" itself was necessary because the original MSA defined "Services" to include "any new services agreed to by the Parties." Syntel Rep. Br. 20 (citing App'x 550 (§ 1.01(99))). Accordingly, Syntel contends

the new "Services" the Amended MSA authorized were those that could leverage TriZetto's confidential trade secrets under Sections 13.01 and 19.01. *See id.* at 20–21 (citing App'x 577, 584). Syntel's reasoning—that the parties made an implied change to the definition of "Services"—is plainly inconsistent with the Amendment's actual changes to the MSA.

While the 2012 Amendment made numerous edits to specific provisions of the MSA, it made no change to the definition of "Services." When the Amendment states that Section 29.17 and any other "related" non-compete provisions are deleted in their entirety, it identifies the definitions impacted.[15] "Services" is not on that list and is not referenced anywhere in the Amendment.

Even if the Amended MSA had somehow implicitly changed the definition of "Services," Syntel unequivocally still could not use TriZetto's trade secrets to offer competing Facets services. The Amended MSA separately prohibits Syntel from "commercially exploit[ing]" any "TriZetto Data." App'x 659 (§ 13.01(3)). Modifying the definition of "Services" (implicitly or otherwise), would not remove that restriction.[16]

Syntel's alternative argument, that the 2012 Amendment "deleted Sections 13.01 and 19.01 in their entirety," is equally divorced from the agreement's language and

---

15. The list includes "Noncompetition Services," "Restricted Period," and "TriZetto Products." App'x 614 (Art. 2(1)); 648–49 (§§ 1.01(58), (73)); 652 (§ 1.01(132)).

16. Further to the point, "Syntel's post-hoc redefinition of 'Services' is also inconsistent" with other relevant MSA terms. TriZetto Br. 52. For example, for all "Services," Syntel needed to provide reports to TriZetto, which included tracking against project plans, estimates, budgets, and staff recruitment and retention—precisely because it was acting as a subcontractor, not a competitor. Those requirements would not make sense if "Ser-

vices" included competing services. The MSA also defines "Service Delivery Organizations" as "the personnel of Service Provider [Syntel Mauritius] and Service Provider Agents who provide the Services," App'x 649 (§ 1.01(77)), and requires that "[a]ll members of the Service Delivery Organization shall be dedicated on a full time basis to the TriZetto account." App'x 657 (§ 10.03(13)). In our view, by definition, "Services" would not encompass Syntel's competitive efforts because everyone performing Services seemingly needed to be dedicated full time to TriZetto's account, not another Syntel customer's.

common sense. Syntel Br. 40, 42–43. Syntel contends both provisions fall within the catch-all phrase deleting "any [ ] provision in the Agreement related to [Syntel] being restricted from competing with TriZetto," App'x 635 (Art. 2(2)), but that interpretation finds no support in the MSA's language. Sections 13.01 and 19.01 recite *confidentiality* protections, not *non-compete* provisions. We find it fanciful to suggest that TriZetto would authorize Syntel to use its trade secrets to compete for business without saying so. Further, we are unpersuaded that the parties—both sophisticated, multi-billion-dollar enterprises—would alter fundamental aspects of their contractual relationship in vague terms or through catch-all provisions.

Even if we considered the Amended MSA to be ambiguous, there is no basis for reweighing the extrinsic evidence that Syntel claims supports its interpretation.[17] Syntel's assertion that extrinsic evidence showed it was authorized to use TriZetto's trade secrets raised factual issues for the jury, which was free to reject those arguments, especially in light of Syntel's lead witness's curious testimony that it would be "flat wrong" to interpret the Amended

MSA as authorizing Syntel to freely use TriZetto's trade secrets to compete. *See* App'x 464–66 (514:6–516:1); 489–90 (620:22–24, 630:1–21). Because Syntel cannot show a "complete absence of evidence supporting the verdict" rejecting Syntel's interpretation, we will not overturn it.[18] *Ashley*, 992 F.3d at 138–39.

In sum, the unambiguous terms of the Amended MSA are clear and so is the extrinsic evidence: TriZetto did not authorize Syntel to use TriZetto's trade secrets to compete with TriZetto. Thus, Syntel misappropriated TriZetto's intellectual property in violation of the DTSA and New York law.

\* \* \*

Accordingly, we affirm the district court's denial of Syntel's Rule 50(b) motion on this issue, too.

### III. Damages.

Syntel separately contends the district court erred by upholding the jury's $285 million compensatory damages award under the DTSA.[19] The primary question presented is whether the DTSA permits recovery of avoided costs as unjust enrich-

---

**17.** Syntel principally relied on two pieces of extrinsic evidence. First was the testimony of Mr. Murlidhar Reddy—the man in charge of Syntel's competing services and Syntel's relationship with TriZetto. At trial, Mr. Reddy testified that TriZetto congratulated Syntel on winning Capitol District Physicians Health Plan's ("CDPHP") business. To Syntel, TriZetto's gesture supported its view that the Amended MSA authorized Syntel to use TriZetto's confidential information while servicing Facets customers. Second, Syntel cites testimony from TriZetto's witnesses stating that TriZetto's confidential materials were necessary for Syntel to provide "complex" consulting services to third parties, such as software upgrades.

**18.** The jury apparently gave both pieces of Syntel's extrinsic evidence little weight. First, there was no evidence corroborating Mr. Reddy's testimony that TriZetto congratulated

Syntel on winning CDPHP business, and the jury was not required to accept it as true. TriZetto also supposedly offered its congratulations in 2013, years before discovering Syntel's misappropriation of its trade secrets. Second, undisputed evidence established Syntel could compete for "less complex" and "low-end" consulting work without using TriZetto's trade secrets, as could many other service providers. *See* App'x 403 (387:1–17); 319 (215:3–6). Even for the "complex" work that required use of the types of tools TriZetto's trade secrets protect, Syntel had options other than misappropriation: independent development at its own expense.

**19.** Syntel does not directly challenge the legality of the district court's permanent injunction or its punitive damages award. That said, it asks this Court to "direct the district court on remand" to "adjust[ ] [the] punitive dam-

ment damages in this specific case. It does not. Accordingly, we vacate the district court's DTSA damages judgment and remand the case for further proceedings consistent with this opinion.[20]

### A. Standard of Review.

[20, 21] "[T]he amount of recoverable damages is a question of fact" reviewed for clear error, but the district court's understanding of whether avoided costs damages are proper under the DTSA in this specific case—i.e., "the applicable damages measurement"—is a legal question reviewed de novo.[21] Bessemer Tr. Co., N.A. v. Branin, 618 F.3d 76, 85 (2d Cir. 2010).

### B. The DTSA's Remedial Scheme.

Before the DTSA's enactment, trade secret plaintiffs claiming misappropriation had to pursue remedies governed by state law. The Uniform Trade Secrets Act ("UTSA") served as a model statute for trade secret laws in forty-eight states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.[22] See David S. Levine & Christopher B. Seaman, The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act, 53 WAKE FOREST L. REV. 105, 113 (2018). One of the DTSA's main intended benefits was that it would provide a "single, national standard for trade secret misappropriation with clear rules and predictability for everyone involved." H.R. Rep. No. 114-529, at 6 (2016); S. Rep. No. 114-220, at 14 (2016); 162 Cong. Rec. H2032 (Rep. Conyers supporting the bill because it "would foster uniformity among

---

ages award" should we vacate the district court's DTSA compensatory damages judgment. Syntel Br. 59–60.

**20.** Syntel argues the district court made two independent errors in upholding the jury's $285 million avoided costs award. The first, Syntel says, was determining that avoided costs damages are available as unjust enrichment damages under the DTSA in *this* specific case. Under the particular facts before us, we agree. Therefore, we need not consider Syntel's second argument: that no reasonable jury could have found that a causal link existed between the $285 million award and any misappropriation alleged by TriZetto after the DTSA's enactment.

**21.** TriZetto contends we must review the district court's DTSA damages judgment under the more deferential abuse of discretion standard. TriZetto frames Syntel's argument on appeal as challenging the excessiveness of the jury's award. To be sure, when assessing whether a damages award is excessive, we have held that damages calculations are "generally within the province of the jury, and a district court's refusal to set aside a jury award will be overturned only for abuse of discretion." TriZetto Br. 25–26 (citing *Paolitto v. John Brown E. & C.*, 151 F.3d 60, 66 (2d Cir. 1998)). But even if we accept TriZetto's

framing of Syntel's arguments, we functionally review *de novo* the district court's decision to uphold the jury's award of avoided costs as unjust enrichment. The jury award fails as a matter of law because the district court's decision to uphold the award is itself "premised on a legal error [and] is necessarily an abuse of discretion." *See, e.g., Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 380 (2d Cir. 2021), *cert. denied*, —— U.S. ——, 142 S. Ct. 757, 211 L.Ed.2d 475 (2022) (functionally reviewing *de novo* denials of motions for leave to amend, to substitute into an action under Rule 17(a), and to approve a class action settlement agreement).

**22.** Despite its name, the UTSA did not induce a uniform set of laws. Although many states have adopted variations of the UTSA, "the state laws vary in a number of ways . . . ." H.R. Rep. No. 114-529, at 4 (2016). The Senate Committee on the Judiciary observed in their consideration of the DTSA that, "[a]lthough the differences between State laws and the UTSA are generally relatively minor, they can prove case-dispositive . . . ." S. Rep. No. 114-220, at 2–3 (2016). Congress thus sought to harmonize the differences in state trade secret law by enacting the DTSA. *See id.* at 14 ("This narrowly drawn legislation will provide a single, national standard for trade secret misappropriation . . . .").

the States"). Accordingly, the DTSA's language and its remedial scheme dictate the analysis when considering the monetary remedies available under the statute.

To be clear, though, the DTSA does not preempt or displace state trade secret law remedies.[23] Indeed, the federal statute directly incorporates certain provisions from the UTSA—for example, the DTSA's compensatory damages provision is "drawn directly" from § 3 of the UTSA.[21] H.R. Rep. No. 114-529, at 13 (2016). There are, as a result, several cases examining state enactments of the UTSA's compensatory damages provision that, in doing so, analyze identical language found in the DTSA.[25]

The DTSA's enactment created a federal civil cause of action for the misappropriation of trade secrets occurring on or after May 11, 2016.[26] Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 2(e), 130 Stat. 376, 381–82 (2016). The remedies available under the DTSA include both equitable relief and monetary damages. For example, the DTSA empowers a federal court to grant an injunction to prevent actual or threatened misappropriation of trade secrets. *See* 18 U.S.C. § 1836(b)(3)(A)(i). Additionally, upon the finding of liability, the DTSA permits the recovery of compensatory damages,[27] punitive damages,[28] and attorney's fees.[29] *See* 18 U.S.C. §§ 1836(b)(3)(B–D).

The DTSA's broad compensatory damages provision allows a court to award: (1) "damages for actual loss caused by the

---

**23.**  *See* 18 U.S.C. § 1838 ("[T]his chapter shall not be construed to preempt or displace any other remedies, whether civil or criminal, provided by United States Federal, State, commonwealth, possession, or territory law for the misappropriation of a trade secret . . . ."); *see also* H.R. Rep. No. 114-529, at 6, 14, 25 (2016).

**24.**  The UTSA provides that "actual loss caused by misappropriation and the unjust enrichment that is caused by misappropriation that is not taken into account in computing actual loss" can all be included as a measure for trade secret compensatory damages. Unif. Trade Secrets Act § 3(a) (amended 1985).

**25.**  Federal courts have expressed views about the availability of avoided costs damages in misappropriation cases arising under state law. In the cases pre-dating the DTSA, the state law claims made their way into federal court due to diversity jurisdiction or supplemental jurisdiction. *See, e.g., Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706, 707, 710 (11th Cir. 1990) (applying Georgia trade secret law while sitting in diversity). The same is true for state-law-based claims filed after the DTSA's enactment. *See, e.g., Epic Systems Corp. v. Tata Consultancy Servs., Ltd.*, 980 F.3d 1117, 1123, 1128 (7th Cir. 2020) (applying Wisconsin's UTSA on two bases, diversity and supplemental jurisdiction); *see also PPG*

*Industries, Inc. v. Jiangsu Tie Mao Glass Co., Ltd.*, 47 F.4th 156, 160 n.10 (3d Cir. 2022) (applying Pennsylvania's UTSA based on supplemental jurisdiction).

**26.**  Although some claims of misappropriation occurred prior to the DTSA's effective date, the parties agree that the profits and losses at issue here arise from misappropriation occurring after May 11, 2016. Syntel's use of TriZetto's trade secrets to conduct UHG's Facets upgrade occurred in November 2016. Accordingly, the application of the DTSA to this controversy is not in question.

**27.**  *See* 18 U.S.C. § 1836(b)(3)(B).

**28.**  *See* 18 U.S.C. § 1836(b)(3)(C) ("[I]f the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the [compensatory] damages awarded under subparagraph (B).").

**29.**  *See* 18 U.S.C. § 1836(b)(3)(D) ("[I]f a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party.").

SYNTEL STERLING BEST SHORES v. THE TRIZETTO GROUP    **809**
Cite as 68 F.4th 792 (2nd Cir. 2023)

misappropriation;"[30] and (2) "*damages for any unjust enrichment caused by* the misappropriation . . . *that is not addressed in computing damages for actual loss*;"[31] or (3) "in lieu of damages measured by any other methods . . . a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret."[32] 18 U.S.C. § 1836(b)(3)(B) (emphasis added). The statute thus permits a plaintiff to recover both its actual losses and a misappropriator's unjust benefit caused by misappropriation, so long as there is no double counting. *See* 18 U.S.C. § 1836(b)(3)(B)(i).

[22] Deciding what constitutes unjust enrichment is a fact-intensive endeavor. Because courts take a "flexible and imaginative approach to damages calculation in trade secret misappropriation cases," unjust enrichment can take several forms and cover a broad array of activity.[33] *GlobeRanger Corp. v. Software AG U.S. of Am., Inc.*, 836 F.3d 477, 499 (5th Cir. 2016). In some instances, unjust enrichment can include "avoided costs"—*i.e.*, the costs a trade secret holder had to spend in research and development that a trade secret misappropriator saves by avoiding development of its own trade secret. *See, e.g., id.*; *see also* Restatement (Third) of Unfair Competition § 45 cmt. f (1995). The parties concede that avoided costs are recoverable as damages for unjust enrichment under the DTSA. They dispute, however, whether avoided costs are available under the particular facts of this case.

To answer that question, one needs to consider the entirety of the DTSA's remedial scheme, not each provision in isolation. *See Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002) (stating that the "meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme"). Section 1836(b)(3)(B)(i)(II) awards compensatory damages to aggrieved trade secret holders whose injuries are not adequately addressed by lost profits. It provides a tool to make trade secret holders whole by further awarding "damages for any unjust enrichment caused by the misappropriation . . . not addressed in computing damages for [their] actual loss"—*i.e.*, in instances where the value of the secret is damaged, or worse yet—destroyed. 18 U.S.C. § 1836(b)(3)(B)(i)(II).

The origins of "unjust enrichment," which is "a basis of civil liability involving a claim for recovery that sometimes also goes by the name *restitution*," *Unjust Enrichment*, BLACK'S LAW DICTIONARY (11th ed. 2019), also inform our review of § 1836(b)(3)(B)(i)(II). *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. c ("In short, most of the law of restitution might more helpfully be called the law of unjust or unjustified enrichment."); *see also* Restatement (Third) of Unfair Competition § 45 cmt. c ("The restitution remedy awards to the plaintiff the enrichment unjustly acquired by the defendant as a result of the appropriation of the plaintiff's trade secret.").

---

30.    18 U.S.C. § 1836(b)(3)(B)(i)(I).

31.    18 U.S.C. § 1836(b)(3)(B)(i)(II).

32.    18 U.S.C. § 1836(b)(3)(B)(ii).

33.    For example, unjust enrichment can include a "defendant's increased profits derived from its use of a misappropriated trade secret." David S. Almeling *et al., Disputed Issues in Awarding Unjust Enrichment Damages in Trade Secret Cases,* 19 SEDONA CONF. J.

667, 687 (2018). Unjust enrichment "may also include any increased business value to [a] defendant that is attributable to the [trade secret] misappropriation, such as the company's potentially lucrative (though difficult to quantify) 'first mover advantage' achieved by acceleration of its product or business to market before that of any other competitor (including the plaintiff)." *Id.*

810 68 FEDERAL REPORTER, 4th SERIES

Restitution may consist of "a return or restoration of what the defendant has gained in a transaction," which "may be a return of a specific thing or . . . a money substitute for that thing." 1 Dan B. Dobbs, *Law of Remedies* § 4.1(1) (1993); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. e(1) (describing "specific restitution" as a "remedy" that may "restore[ ] the identical asset that the claimant has lost"). To the extent that TriZetto's trade secrets were "specific thing[s]" that TriZetto sought to recover from Syntel, the district court's remedial order accomplished that restitutionary goal by ordering Syntel to "remove from its possession and quarantine" the 104 trade secrets at issue. App'x 2325.

The remedy of restitution can sometimes require more than the return of specific things. Indeed, "there are significant instances of liability based on unjust enrichment that do not involve the restoration of anything the claimant previously possessed." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. c. Such instances can arise in cases where a defendant profits from the plaintiff's property. Under such circumstances, an "accounting of the defendant's profits on sales attributable to the use of the trade secret" may serve as one available remedy for trade secret misappropriation. Restatement (Third) of Unfair Competition § 45 cmt. f.

In still other circumstances, restitution can require a defendant to return the costs it saved through the misappropriation of a plaintiff's property. The Third Restatement of Unfair Competition explains that

"[i]n some situations the defendant's enrichment is represented by profits from sales made possible by the appropriation," while in others it is represented "by savings achieved through the use of the trade secret in the defendant's business." Restatement (Third) of Unfair Competition § 45 cmt. c. Under the common law, in other words, "[a] saved expenditure . . . is no less beneficial to the recipient than a direct transfer." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d. But the amount of avoided costs damages recoverable must still derive from "a comparative appraisal of all the factors of the case," among which are "the nature and extent of the appropriation" and "the relative adequacy to the plaintiff of other remedies." Restatement (Third) of Unfair Competition § 45(2).[34] Awarding avoided costs in the absence of such a comparative appraisal risks producing an unjust windfall for trade secret holders.[35]

Accordingly, for purposes of deciding whether unjust enrichment in the form of avoided costs was permissibly awarded in this case, the relevant question is: did Syntel's misappropriation injure TriZetto *beyond* its actual loss of $8.5 million in lost profits? The answer to that legal question turns on several important facts—for example, TriZetto retaining the use and value of its trade secrets and the district court permanently enjoining Syntel from using TriZetto's secrets. These facts matter; the DTSA's equitable remedies work as a powerful tonic to reduce the harm a trade secret holder suffers beyond its lost business. The DTSA allows district courts

---

**34.** Such an appraisal might well support an avoided costs award where misappropriation effectively destroys a trade secret, precluding both the secret's restitution to its owner and a reliable measure of the owner's future lost profits. The example is merely illustrative, not exhaustive.

**35.** These common law principles are consistent with the language and the structure of the DTSA.

to enjoin the misappropriation of a trade secret to prevent its continued use and/or its diminution in value. *See* 18 U.S.C. § 1836(b)(3)(A)(i).

Reading the statute's compensatory damages provision otherwise—as focusing *exclusively* on Syntel's saved expenses to award avoided costs—ignores the extent to which Syntel's misappropriation injured TriZetto and impermissibly discounts the comparative appraisal that governs equitable trade secret remedial determinations. *See* Restatement (Third) of Unfair Competition § 45(2). Under that reading, avoided costs would be available as unjust enrichment damages in any case of misappropriation, even where a trade secret owner suffers *no compensable harm* beyond its lost profits or profit opportunities. If accepted, that view would permit avoided costs awards that are more punitive than compensatory.[36] That would be a curious distortion of the DTSA's remedial scheme and would ignore the significance and the reach of a district court's permanent injunction power.

## C. Analysis.

[23] There is no dispute that Syntel unjustly benefitted from misappropriating TriZetto's trade secrets to service UHG (*i.e.*, earning $27 million in revenue, corresponding to $823,899 in profits). But criti-

cally, those profits were the only enrichment Syntel unjustly gained at TriZetto's expense, and they were "addressed in computing damages for [TriZetto's] actual loss." 18 U.S.C. § 1836(b)(3)(B)(i)(II). TriZetto's expert testified that the actual loss TriZetto suffered post-DTSA from Syntel using its trade secrets to service UHG was $8.5 million in lost profits. *See* App'x 412 (396:9–12); 433 (419:4–8). Thus, through its misappropriation, Syntel realized $823,899 in unjust profits "at the expense of" TriZetto's $8.5 million profit opportunity.[37] *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).

Beyond its lost profits, however, TriZetto suffered no compensable harm supporting an unjust enrichment award of avoided costs. The district court's permanent injunction ended Syntel's use of TriZetto's trade secrets, and, therefore, its ability to profit from any avoided costs. Further, Syntel's misappropriation did not diminish, much less destroy, the secrets' continued commercial value to TriZetto. In fact, TriZetto has retained the profitable use of its trade secrets; Facets is worth even more today than it was when the misappropriation occurred. Accordingly, TriZetto is not entitled to avoided costs as a form of unjust enrichment damages in this specific case.

---

**36.** The policy of punishing wrongdoers is already served by the DTSA's separate provision for punitive damages. *See* 18 U.S.C. § 1836(b)(3)(C).

**37.** As noted above, TriZetto's expert (Britven) presented three damages theories to the jury at trial. TriZetto's principal theory was unjust enrichment based on avoided development costs. As a first alternative, Britven presented a reasonable royalty theory that set damages at 50% of TriZetto's relevant development costs, or $142 million. As a second alternative, he suggested that TriZetto's damages should be the $8.5 million in TriZetto lost profits. TriZetto was of the view that an

award of lost profits ($8.5 million) and avoided costs damages ($285 million) would constitute impermissible double recovery under the DTSA. The jury was therefore not asked to specify the source of its compensatory damages award under the DTSA. Because the jury awarded TriZetto avoided costs damages, the jury did not specifically decide to award TriZetto lost profits damages. We do not need to decide the extent to which an award of lost profits and avoided costs may (or did) overlap under the DTSA, as the question before us is limited to whether avoided costs are recoverable as a matter of law under these facts.

To be sure, future cases may present a range of factual scenarios concerning a defendant who has realized only modest profits from its misappropriation of trade secrets but has, nevertheless, been enriched by avoided costs in a larger amount at the expense of the secret holder. This might depend on, for example, the extent to which the defendant has used the secret in developing its own competing product, the extent to which the defendant's misappropriation has destroyed the secret's value for its original owner, or the extent to which the defendant can be stopped from profiting further from its misappropriation into the future. But in this case, perhaps unusually, none of those circumstances supports awarding TriZetto $285 million of the costs it spent in developing the misappropriated secrets. TriZetto's valuable trade secrets are still that—valuable and secret.

Most of the cases TriZetto and the district court employ to support awarding avoided costs concern claimants who, at least to some degree, lost the value of their misappropriated trade secrets.[38] Avoided costs compensated for that loss. For example, in *GlobeRanger Corp. v. Software AG U.S. of Am., Inc.*, the defendant "used the [claimant's trade secrets] in developing its own product," thereby diminishing the value of the trade secret to the claimant. 836 F.3d 477, 499 (5th Cir. 2016). In *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, too, the defendant destroyed the value of a claimant manufacturer's trade

secret when it adopted and used the manufacturer's vaccine production process to create its own competing vaccine.[39] 908 F.2d 706, 712, 714–15 (11th Cir. 1990). But again, this case is different: TriZetto offered no proof that Syntel's misappropriation diminished the value of its trade secrets to any degree.

Syntel never developed or sold a competing software product using TriZetto's trade secrets. Syntel competed for services in a market in which Syntel and other third parties were routinely granted permission to use TriZetto's trade secrets, often for free. TriZetto contends that there is no difference from an avoided costs perspective when the trade secrets relate to competing services as opposed to a competing product. Even if that were so—a point we need not decide—that argument misses the point. Syntel might have had to turn over avoided costs (or some portion of avoided costs) for using TriZetto's trade secrets to gain a significant head start into the market for Facets-related services if, for example, it either diminished the value of, or publicly disclosed, TriZetto's trade secrets while advertising or providing Facets services to third parties. But TriZetto offered no proof that is what happened here.

Our holding might appear in some tension with *Epic Systems Corp. v. Tata Consultancy Services, Ltd.*, a Seventh Circuit decision applying Wisconsin's Uniform Trade Secrets Act.[40] 980 F.3d 1117 (7th

---

**38.** We need not consider the unpublished out-of-circuit decisions that TriZetto cites.

**39.** The Eleventh Circuit "enjoined defendants from disclosing Salsbury's trade secrets and from using Stabilizer H but not from producing or selling the competing vaccine." *Id.* at 708.

**40.** As discussed *supra* at 808 n.25, the Wisconsin UTSA's compensatory damages provi-

sion mirrors the DTSA's. *Compare* Wis. Stat. § 134.90(4)(a) ("A court may award [compensatory] damages in addition to, or in lieu of, injunctive relief under sub. (3). Damages may include both the actual loss caused by the violation and unjust enrichment caused by the violation that is not taken into account in computing actual loss."), *with* 18 U.S.C. § 1836(b)(3)(B)(i) ("A court may . . . award . . . [compensatory] damages for any unjust enrichment caused by the misappropriation

Cir. 2020). There, the Seventh Circuit upheld a $140 million avoided costs award based on the "significant head start" in operations TCS gained through misappropriation.[41] *See id.* at 1130, 1132–33. Importantly, however, Epic suffered no economic harm from TCS's misappropriation, *id.* at 1144 n.5, and the "district court entered an injunction prohibiting TCS from using, possessing, or retaining any of Epic's trade secrets." *Id.* at 1127. We disagree with the court's reasoning insofar as it can be seen to endorse a view that avoided costs are available as compensatory damages under the DTSA *whenever* there is misappropriation of any trade secret relating to an owner's product. To the extent no corresponding harm to the trade secret owner would be necessary, such a view

unhinges avoided costs from the DTSA's compensatory moorings and overlooks the remedial benefits, as here, of a timely injunction that prevents the dissemination and use of a trade secret.[42] *Cf.* 4 Roger M. Milgrim, *Milgrim on Trade Secrets* § 15.02 (measuring an unjust enrichment award "by the value of the misappropriated trade secret . . . may preclude an award of injunctive relief on the theory that having received the full value of its trade secret, the owner is not entitled to further relief").

Here, as well, the district court effectively awarded punitive damages under the guise of compensatory damages. TriZetto presented evidence of the actual financial impact of Syntel's actions on both parties. Yet rather than focusing on that evidence, the district court reasoned that avoided

---

. . . that is not addressed in computing damages for actual loss.").

41. TCS used Epic's trade secrets to create a "comparative analysis"—a spreadsheet comparing TCS's health-record-software (called "Med Mantra") to Epic's software. *Id.* at 1123. TCS used the comparative analysis in "an attempt to enter the United States health-record-software market, [in an unsuccessful attempt] to steal Epic's client, and [to] address key gaps in TCS's own Med Mantra Software." *Id.*

42. TriZetto and the district court also cite *Steves & Sons, Inc. v. JELD-WEN, Inc.* to support awarding avoided costs. No. 16-cv-545-(REP), 2018 WL 2172502 (E.D. Va. May 10, 2018). There, the district court denied Steves' motion for summary judgment on JELD-WEN's trade secret misappropriation damages claims arising under the DTSA and Texas's UTSA. *Id.* at *1. In the court's view, JELD-WEN presented enough evidence on its unjust enrichment claim to avoid summary judgment. *Id.* at *7. It reasoned avoided costs could be available where the defendant used doorskin manufacturing trade secrets to assess the feasibility of building a competing manufacturing plant. *Id.* The avoided costs theory went: Steves' possession of trade secrets about important manufacturing components would allow it to "increase the plant's profitability through a reduction in its per

skin costs." *Id.* at *3. Critically, however, Steves did not build the plant—it only took limited steps towards doing so, such as negotiating with potential business partners. *Id.* at **5, 7. Moreover, JELD-WEN suffered minimal harm from the actual misappropriation, and the injunctive relief it requested would have precluded Steves' future use of the trade secrets. *Id.* at **4, 10.

TriZetto never referenced *PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co., Ltd.* in support of its argument to uphold the district court's avoided costs award. 47 F.4th 156 (3d Cir. 2022). There, the Third Circuit affirmed an $8.8 million avoided costs award under Pennsylvania's UTSA even though the claimant "did not demonstrate actual loss from [the defendant's] misappropriation," and a permanent injunction prevented the defendant from any further misappropriation of the claimant's secrets. *Id.* at 161, 163; *compare* 12 Pa. Cons. Stat. Ann. § 5304(a), *with* 18 U.S.C. § 1836(b)(3)(B)(i). As with *Epic Systems Corp.*, we decline to follow the reasoning of these two decisions. They denied summary judgment on/affirmed avoided costs awards based *solely* on the defendant's cost savings, despite no corresponding harm to the trade secret holder. That result is inconsistent with our view of when avoided costs are available as unjust enrichment damages under the DTSA. *See* 18 U.S.C. § 1836(b)(3)(B)(i)(II).

costs that have no correlation to Syntel's gain at TriZetto's expense were appropriate because Syntel "should bear the business risk" of its misappropriation regardless of its temporal length. Special App'x 16. To the extent the district court deemed it necessary to punish Syntel for any unrealized potential profits or "business risk" it took, that punishment is appropriately considered in the context of punitive damages under the DTSA. *See* 18 U.S.C. § 1836(b)(3)(C).

Accordingly, we conclude that, as a matter of law, an unjust enrichment award of avoided costs was unavailable under the specific facts of this case. Syntel's unjust gain was fully "addressed in computing damages for [TriZetto's] actual loss," and TriZetto suffered *no compensable harm* beyond that actual loss. *See* 18 U.S.C. § 1836(b)(3)(B)(i)(II). Syntel's onetime use of the trade secrets to service UHG did not jeopardize their continued value to TriZetto. TriZetto—*not Syntel*—currently retains their profitable use, and a permanent injunction prohibits Syntel from using them in the future. Awarding TriZetto $285 million of the costs it incurred to develop its trade secrets would be inconsistent with the purpose of avoided costs in trade secret cases and with the DTSA's remedial scheme. Under these facts, upholding the avoided costs award would entitle TriZetto to a windfall. The district

court's DTSA damages judgment is vacated.

### D. Disposition.

**[24, 25]** We remand the case for the district court to address the propriety of the two jury awards based on TriZetto's damages theory of awarding a reasonable royalty: (1) the $142,427,596 New York trade secret misappropriation award and (2) the $59,100,000 copyright infringement award. Although the parties addressed the propriety of these awards in their motion papers below,[43] there was nothing to appeal here since the jury, to avoid double counting, did not factor them into their total compensatory damages award, instead relying exclusively on the $284,855,192 damages in avoided costs for the DTSA claim.[44] *See* Special App'x 12 n.3; App'x 2254.

Of note, we *do not* remand for the court to determine if TriZetto is entitled to lost profit damages under § 1836(b)(3)(B)(i)(I) of the DTSA. To be sure, TriZetto's expert testified that the company suffered $8.5 million in lost profits through Syntel's misappropriation, and the district court instructed the jury that TriZetto could recover those lost profits as damages under the DTSA. But at trial, TriZetto took the view that awarding lost profits and avoided costs would constitute "double counting" under the DTSA; the district court accept-

---

**43.** In its Rule 50(a) and Rule 50(b) motions, Syntel objected to the jury's reasonable royalty awards of $142 million for trade secret misappropriation under New York law and $59 million for copyright infringement because: (1) both were based on avoided costs that are inapplicable in this case; and (2) both were based on a 50/50 split methodology between TriZetto and Syntel for avoided costs that is improper as a matter of law. As mentioned, the district court did not resolve the challenge to either award because it awarded avoided costs under the DTSA.

**44.** Both Syntel and TriZetto waived consideration by this Court of the propriety of the $142 million reasonable royalty award under New York law. Syntel waived the argument that the award was improper by raising it only in a footnote on appeal. *See U.S. v. Restrepo,* 986 F.2d 1462, 1463 (2d Cir. 1993). And the same is true for TriZetto, who also addressed the award's propriety only in a footnote. *See* TriZetto Br. 75–76 n.3 ("[E]ven if Syntel were to prevail on its avoided-cost argument, TriZetto is at least entitled to a $142 million reasonable royalty.").

ERIE INS. EXCH. BY STEPHENSON v. ERIE INDEMNITY **815**
Cite as 68 F.4th 815 (3rd Cir. 2023)

ed that view. Special App'x 15. As a result, the verdict form that TriZetto proposed and the district court accepted did not ask the jury to determine if (and to what amount) TriZetto was entitled to lost profit damages. Because TriZetto does not argue on appeal that it is entitled to its lost profits if we vacate the avoided costs award, we do not instruct the district court to consider the issue on remand.

## CONCLUSION

For the foregoing reasons, we **AFFIRM IN PART** and **VACATE IN PART** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.



**ERIE INSURANCE EXCHANGE, an unincorporated association, BY Troy STEPHENSON, Christina Stephenson, and Steven Barnett, trustees ad litem, and alternatively, Erie Insurance Exchange, by Troy Stephenson, Christina Stephenson, and Steven Barnett**

v.

**ERIE INDEMNITY COMPANY, Appellant**

No. 23-1053

United States Court of Appeals, Third Circuit.

Argued April 20, 2023

(Filed: May 22, 2023)

**Background:** Subscribers to insurance plans offered by insurance group, as trustees ad litem for reciprocal insurance exchange, filed state court action alleging that exchange's managing agent breached its fiduciary duty to subscribers by charging excessive management fee. After removal, the United States District Court for the Western District of Pennsylvania, Cynthia R. Eddy, Chief United States Magistrate Judge, 2022 WL 4534746, remanded case to state court. Agent appealed.

**Holdings:** The Court of Appeals, Smith, Circuit Judge, held that:

(1) action was not class action over which Class Action Fairness Act (CAFA) could provide removal jurisdiction, and

(2) action was not continuation of previously removed, voluntarily dismissed class action.

Affirmed.

**1. Federal Courts** ⇐2015

Federal courts are courts of limited jurisdiction, and they possess only that power authorized by Constitution and statute.

**2. Federal Courts** ⇐2081

Federal court presumes that cause lies outside its limited jurisdiction.

**3. Removal of Cases** ⇐107(7)

Party seeking removal bears burden of establishing federal jurisdiction.

**4. Federal Courts** ⇐3574, 3581(1)

Court of Appeals reviews issues of subject matter jurisdiction and statutory interpretation de novo.

**5. Courts** ⇐90(2)

Only when Supreme Court authority has undermined rationale of circuit precedent may panel of Court of Appeals reconsider contrary prior holdings without having to resort to en banc rehearing.